## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

GRANT KAISER and JOHN FURNISH,

               Plaintiffs,

v.

WILLIAM DEAN KIRCHICK, CAROL
RUDNICK KIRCHICK, individually and as
TRUSTEE of the 41 SEAVIEW TERRACE
REAL ESTATE TRUST, and RONALD
STEVEN RUDNICK,

               Defendants.

Civil Action No. _____

## COMPLAINT AND JURY DEMAND

### i. Introduction

1.      Plaintiffs Grant Kaiser ("Mr. Kaiser") and John Furnish ("Mr. Furnish") (together "Plaintiffs") are a married couple who reside in Texas. In 2008, Plaintiffs bought what they believed to be their dream vacation home in Chatham, Massachusetts. Defendants William Dean Kirchick ("Mr. Kirchick"), and his wife, Carol Rudnick Kirchick ("Mrs. Kirchick") (together "the Kirchicks"), are Plaintiffs' adjacent neighbors in Chatham. Defendant Ronald Steven Rudnick ("Mr. Rudnick") is Mrs. Kirchick's brother. Together, Defendants have turned Plaintiffs' peaceful vacation haven into a nightmare. As now revealed and documented, Defendants carefully crafted a multipronged plan of "attack" on Plaintiffs. Defendants have subjected Plaintiffs to an unconscionable pattern of harassment, intimidation, defamation, threats, and coercion designed to interfere with Plaintiffs' use and enjoyment of their home and the broader Chatham community.  All of this has been done in an effort to drive Plaintiffs to give in to Defendants' demands or leave the community.

2.      Incredibly, this matter arises from a series of seemingly simple requests by the Kirchicks to Plaintiffs that Plaintiffs move or eliminate certain vegetation in their yard so as to improve the view from the Kirchicks' home, much of which Plaintiffs accommodated at their own expense. Indeed, when Plaintiffs bought their home approximately a decade ago, and in the spirit of being good neighbors, they sought and to listened to the Kirchicks input on the professional landscaping plan they intended to implement on their property. They made changes at their own expense until the Kirchicks told them that Plaintiffs' plans were both appreciated and met with their approval. Thereafter, years passed. The Kirchicks said nothing until they decided to ask Plaintiffs to move or remove two mature pear trees because they allegedly interfered with the Kirchicks' view of a golf course and the distant ocean from their second-floor guest bedroom (in a home that they only occasionally use). In this instance, however, given the maturity and location of the trees, Plaintiffs could not accommodate their request. In response, the Kirchicks and Mr. Rudnick (together "Defendants") irrationally crafted and launched their hate-filled plan of attack against Plaintiffs. The now years-long campaign has affected all aspects of Plaintiffs' lives, including their reputations. As one example only, Defendants conspired to cause numerous business owners in the small community of Chatham to obtain, without any legitimate basis whatsoever and despite not even knowing Plaintiffs, so-called police NO TRESPASS orders to bar Mr. Kaiser, and as a practical matter, his husband, Mr. Furnish from their premises. Through Mr. Rudnick, Defendants necessarily suggested to these local business owners that Plaintiffs somehow presented a danger if they even entered into their otherwise open to the public establishments. Defendants successfully caused these business owners to deny Plaintiffs access to numerous local public accommodations. For a married, same sex couple, such

tactics were and remain extraordinarily intimidating, inherently threatening, and coercive, all in addition to being destructive of Plaintiffs' reputations in the Chatham community.

3.     As alleged below, Defendants, in combination, in fact and through their actions, present a uniquely potent force for the purpose of threatening, intimidating, coercing, and harassing Plaintiffs, as they are well established in Chatham and in Massachusetts. Mr. Kirchick is a partner at the prominent Boston law firm Nutter, McLennan and Fish LLP. Mrs. Kirchick, too, is a lawyer, although she is an inactive member of the bar. Mr. Rudnick, by his own description to Plaintiffs, claims to be a wealthy, well-connected real estate developer and property owner in Barnstable County. He has repeatedly told Plaintiffs that he enjoys connections to and supposed influence over Cape Cod officials. Both before and during the course of the unlawful attack they have suffered, Plaintiffs learned that Mr. Rudnick has a criminal record and is someone who, at the very least, appears to wield influence over the local business community in Chatham which have barred Plaintiffs from entering their premises.

4.     Defendants have engaged in an unlawful pattern of conduct by, without limitation: (i) threatening to make Plaintiffs' "lives miserable" until Plaintiffs capitulate to their unlawful demands, or leave Chatham; (ii) threatening to destroy Plaintiffs' property; (iii) trespassing on Plaintiffs' property; (iv) threating to remove Plaintiffs' mailbox, in violation of federal law, including 18 U.S.C. § 1705; (v) threatening to use their alleged influence with local authorities against Plaintiffs; (vi) threatening to use and using their combined influence to deny Plaintiffs access to local accommodations; (vii) encouraging others to take meritless actions against Plaintiffs; (viii) impeding access to Plaintiffs' property by deliberately placing commercial trucks and other vehicles at the entrance of the private way leading to Plaintiffs'

home, for days and weeks at a time; and (ix) following and harassing service providers working on Plaintiffs' yard.

5.     Defendants are liable to Plaintiffs in damages for their actions which Plaintiffs seek to recover through this lawsuit. Plaintiffs further seek here a permanent injunction against Defendants enjoining them from further threatening, intimidating, coercing or harassing Plaintiffs, upon pain of contempt.

## ii. The Parties

6.     Plaintiff Grant Kaiser is a citizen and domiciliary of the State of Texas with a primary residence in Houston, Texas.

7.     Plaintiff John Furnish is also a citizen and domiciliary of the State of Texas with a primarily residence in Houston, Texas.

8.     Since 2008, Mr. Kaiser and his husband Mr. Furnish have owned, improved, and seasonally occupied their home located at 39 Seaview Terrace in Chatham, Massachusetts.

9.     Defendant William Dean Kirchick is a citizen and domiciliary of the Commonwealth of Massachusetts.

10.     Defendant Carol Rudnick Kirchick is a is a citizen and domiciliary of the Commonwealth of Massachusetts.

11.     On information and belief, Mr. and Mrs. Kirchick are married and reside in Dover, Massachusetts.

12.     Upon information and belief, Mr. and Mrs. Kirchick are the beneficiaries of the 41 Seaview Terrace Real Estate Trust which owns the home located at 41 Seaview Terrace in Chatham, Massachusetts, adjacent to Plaintiffs' home. Mr. and Mrs. Kirchick, as well as other of their family members, occasionally use this home on a seasonal basis.

13.     Defendant Ronald Steven Rudnick a is a citizen and domiciliary of the Commonwealth of Massachusetts. He resides in Chatham, Massachusetts and is Mrs. Kirchick's brother.

14.     Mr. Rudnick is a licensed real estate broker and a licensed contractor who owns and/or manages properties in Chatham and throughout Cape Cod. The Kirchicks enlisted Mr. Rudnick for the purpose of using his unique position locally to pressure and coerce Plaintiffs into cutting down their trees. Mr. Rudnick repeatedly threatened Plaintiffs that he would use his influence to retaliate against Plaintiffs. More specifically, Mr. Rudnick, with the full knowledge, support and approval of the Kirchicks, repeatedly verbally threatened Plaintiffs that he would make their lives "miserable" or "drive [them] out of town" if they did not agree to cut down their trees in order to improve the view from a guest bedroom of a home that his sister and brother-in-law occasionally use. At all times pertinent hereto, Mr. Rudnick acted in concert with, and as the agent of, his sister and brother-in-law, acting at their express request and direction, as voluminous emails and other evidence make plain.

15.     Defendant 41 Seaview Terrace Real Estate Trust ("Trust") owns the home located at the same address. On information and belief, Mrs. Kirchick is a Trustee of the Trust and the Kirchicks are the beneficiaries of the Trust.

### iii. Jurisdiction and Venue

16.     Jurisdiction is proper pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship and the amount in controversy exceeds $75,000. Among other direct out of pocket costs, and without limitation, Plaintiffs have been put to expenses in excess of $75,000 in dealing with and responding to Defendants' plan of attack.

17.     Venue is proper pursuant to 28 U.S.C. § 1391.

## iv. <u>Facts</u>

### *In 2011 and at Their Own Expense, Plaintiffs Accommodated the Kirchicks' Wishes to Change the Landscaping at 39 Seaview Terrace*

18.    In July 2008, Plaintiffs purchased their home at 39 Seaview Terrace in Chatham, Massachusetts. Plaintiffs' home is part of a small, private sub-division named Seaview Terrace.

19.    The Kirchicks purchased 41 Seaview Terrace in Chatham, which is next door to Plaintiffs' property and, in approximately 2008-2009, built a new home there. The Kirchicks have owned the property at 41 Seaview Terrace in their names, or through the 41 Seaview Terrace Real Estate Trust, since purchasing it in 1999.

20.    41 Seaview Terrace is located directly in front of 39 Seaview Terrace. The trees and vegetation at issue run along the property line between 39 and 41 Seaview Terrace and are planted within the bounds of 39 Seaview Terrace.

21.    In December 2008 and with the intention of being good neighbors, Plaintiffs reached out to the Kirchicks to discuss trees planted by their builder along the fence line between 39 and 41 Seaview Terrace. Plaintiffs told the Kirchicks they did not want to block their neighbor's view and offered to remove one or more of the trees, if the Kirchicks desired. Thereafter, Plaintiffs shared with the Kirchicks a landscaping plan prepared by a professional architect. In response, the Kirchicks stated, in writing at various times, that they were delighted by Plaintiffs actions to accommodate them and that they approved of Plaintiffs' plan. By this response, Plaintiffs understood that their plan resolved all issues regarding the trees and vegetation in their yard. A copy of the May 6, 2011 email is attached as <u>Exhibit 1</u>.

22.    Years followed with no word or complaint from the Kirchicks about the trees. Indeed, up until 2017, although not friends, Plaintiffs and the Kirchicks enjoyed what Plaintiffs believed to be a friendly, neighborly relationship.

*Beginning in Summer 2017, Defendants Demanded Plinaintiffs Harm the Value of Their
Property by Removing Mature Trees to Improve the View from a Second Floor Guest
Bedroom in the Kirchicks' Occasionally Used Vacation Home*

23.     Apparently at some time during the Summer of 2017 the Kirchicks decided that

they wanted Plaintiffs to remove more trees in order to improve the view from a guest bedroom

in the back of their house at 41 Seaview Terrace. Defendants apparently believed, in particular,

that securing the removal of two of Plaintiffs' mature pear trees would increase the value of their

property.

24.     In July 2017, even before communicating their request to Plaintiffs, the Kirchicks

began exploring their options. According to later revealed, private communications between and

among Defendants, after failing to find a law "on the books protecting the value of a view," Mrs.

Kirchick conceded that "[t]here's probably nothing legally we can do at this point." *See* July 27,

2017 email attached as <u>Exhibit 2</u>. Instead, the Kirchicks began planning and conspiring with Mr.

Rudnick to find non-legal ways to force Plaintiffs into removing additional trees that were not

part of the plan Mr. Kirchick approved in 2011.

25.      On August 12, 2017, and without knowledge of their true intentions, Mr. Kaiser

met with the Kirchicks. They asked him to cut down two of Plaintiffs' mature, healthy pear trees.

The Kirchicks took Mr. Kaiser to an upstairs spare bedroom to show him their dissatisfaction

with their view.

26.     Despite having no legal obligation to move (much less cut down) the trees,

Plaintiffs in good faith did in fact again consult with landscape architects, landscape maintenance

companies, and arborists about what options might be available.

27.     However, before Plaintiffs could complete their investigation into the feasibility

of moving one or more of the trees, and unbeknown to Plaintiffs at the time, Defendants jointly

7

began plotting their campaign of non-legal ways to threaten, intimidate, and coerce Plaintiffs into removing the trees.

### *Defendants Conspire to Harass Plaintiffs and Intentionally Inflict Emotional Distress Through a Campaign Designed to Threaten, Intimidate, and Coerce Them into Selling Their Home and/or Leaving Chatham*

28.     What seemingly started as an issue about two pear trees at 39 Seaview Terrace, thereafter, devolved on Defendants' part into an obsessive hatred of Plaintiffs and a long-running campaign which can be explained only by their irrational and deep-seated hatred for the same-sex couple next-door. Indeed, it defies logic that anyone would spend so much time, energy, money, and involve the greater Chatham community simply to pursue a better view from a guest bedroom in a sporadically used second home without some other motive.

29.     Email communications between and among Defendants reveal the startling lengths to which they plotted and implemented their campaign of harassment against Mr. Kaiser and Mr. Furnish through threats, intimidation, and coercion.

30.     For example, and without limitation, in August 2017, Defendants considered asking the Town of Chatham to destroy the private landscaped rock and cobble driveway leading to Plaintiffs' property, in which Plaintiffs have legal rights, by paving it over. The same day, Mr. Rudnick, at the request of Mrs. Kirchick, began instructing employees of a company which he either owns or controls, to park commercial trucks displaying the Lighthouse Realty Property Management logo ("Lighthouse Realty Truck(s)") at the entrance of the private way leading to Plaintiffs' home, which is the sole means of accessing Plaintiffs' home. Defendants' purpose was to send a message to Plaintiffs that life would become unpleasant for them if they did not capitulate to Defendants' demands.

31.     Mr. Rudnick had his employees leave the trucks parked at the entrance of the private way leading to Plaintiff's home, sometimes for weeks at a time. Mrs. Kirchick sent an email to her brother, Mr. Rudnick, thanking him for doing so: "Thanks, Ron. I really appreciate it. It's disappointing . . . that these guys are such jerks. . . . I hate when people do shit just because they can without regard to how it affects anyone else. Selfish bastards." *See* August 21, 2017 email attached as Exhibit 3.

32.     Emails between Mrs. Kirchick and her brother reflect that Defendants' purpose in parking Mr. Rudnick's Lighthouse Realty Truck in the private way was to deliver an intimidating message and to cause them emotional distress. Eventually, Mrs. Kirchick told Mr. Rudnick to "start planting in the flatbed" to drive home their intent to diminish Plaintiffs' use and enjoyment of their property and to cause them emotional distress. *See* September 14, 2017 email attached as Exhibit 4. Referring to the Lighthouse Realty Truck, Mrs. Kirchick later wondered to her brother if Plaintiffs would interpret the flatbed truck as harassment.

33.     On August 22, 2017, Mrs. Kirchick asked her husband and brother whether they thought the Cape Cod Chronicle would be interested in writing a newspaper story about Plaintiffs to try to embarrass and humiliate them, in order to intimidate and pressure them into capitulating to Defendants' demands that they cut down the pear trees on their property.

34.     Later the same day, Mrs. Kirchick wrote to Mr. Kirchick and Mr. Rudnick and expressed her desire to "burn" Plaintiffs' trees. *See* August 22, 2017 email attached as Exhibit 5.

35.     On August 31, 2017, the Kirchicks and Mr. Rudnick emailed one another expressing pleasure about their efforts to harass Plaintiffs by obstructing their sole means of ingress and egress to their property, taking satisfaction that the placement of Rudnick's Lighthouse Realty Truck so as to impede passage to Plaintiffs' home resulted in Plaintiffs'

landscapers having trouble getting their truck in the private way leading to Plaintiffs' home. *See* August 31, 2017 email attached as <u>Exhibit 6</u>. Mrs. Kirchick wrote to her husband and her brother, "By the way, they had trouble getting the truck in the driveway," putting a "smile" emoji after the word "driveway" to express her satisfaction with this result. *Id.*

36.     Mr. Rudnick thereafter continued to park his Lighthouse Realty Truck at the entrance of the private way leading to Plaintiffs' home, at the Kirchicks' request, to harass Plaintiffs. On September 11, 2017, Mr. Rudnick instructed Mrs. Kirchick to tell Plaintiffs to talk to him if they asked about the truck.

37.     The next day, September 12, 2017, Mr. Kirchick emailed his wife expressing concern that Plaintiffs were not sufficiently getting the right message from the truck parked at the entrance of the private way which was intended to pressure them. He wrote: "So he [Kaiser] thinks the truck is parked there to do work on our house???" A copy of this September 12, 2017 email is attached as <u>Exhibit 7</u>. Mrs. Kirchick promptly forwarded the message to her brother, Mr. Rudnick. *Id.* Mr. Kirchick knew the truck was not parked where it was to do work on the Kirchicks' house; it was parked there to harass Plaintiffs, and he was concerned that the truck was not having its desired effect.

38.     By September 12, 2017, the Lighthouse Realty Truck had been parked at the entrance of the private way leading to Plaintiffs' home for more than three weeks without being moved. Mr. Kaiser politely let the Kirchicks know as much by contacting them to alert them to the fact that if the truck was supposed to be there in connection with work being done on the Kirchicks' home (of course, it wasn't, and there wasn't any work being done on the home), the Kirchicks should know that there had not been any workers at their home. *See* September 13, 2017 email attached as <u>Exhibit 8</u>. Defendants internally discussed what they should say in

response. Mrs. Kirchick proposed writing: "Does the truck bother you even though it doesn't affect your enjoyment of your property? Now you know what those damn trees are doing to us." *Id.* Mr. Kirchick emailed his wife and suggested she add, "you fargin axels" to the end of the sentence. *Id*. Although it is difficult to know exactly what Mr. Kirchick meant in using this term, Plaintiffs perceive it to be extremely derogatory and personally offensive.

39.     The emails establish that Defendants' parking the commercial truck in the private way was simply to harass Plaintiffs. However, Mr. Kirchick consciously decided to lie to Mr. Kaiser in writing by sending him an email from his Boston law firm email account with his law firm's logo, saying: "the work should be done by the 23rd but if not, my brother-in-law thinks it should be done by the end of the month." *See* September 12, 2017 email attached as <u>Exhibit 9</u>.

40.     A few days later, on September 15, 2017, Mr. Rudnick emailed his sister about coordinating their "plan for the attack" against Plaintiffs. *See* September 15, 2017 email attached as <u>Exhibit 10</u>.

41.     On October 18, 2017, Mrs. Kirchick proposed to her brother and husband that they threaten to remove the cobblestones on the private way leading to Plaintiffs' property. She suggested they could "write to the jerks and say we are removing the cobblestones on our property and where would they like them?" *See* October 18, 2017 email attached as <u>Exhibit 11</u>. Later the same day, Defendants continued to discuss removing the cobblestones and putting them on Plaintiffs' porch in order to retaliate against them, intentionally cause emotional distress, and pressure them into taking down the pear trees.

42.     In mid-December 2017, Defendants' emails discussed ways of continuing their harassment campaign against Plaintiffs, including by painting the private way purple and restricting Plaintiffs from maintaining and making improvements on the portion of the private

way in which they have legal rights. Although it is impossible for Plaintiffs to know Defendants'

motivation in planning to paint a portion of the private way purple, the homophobic connotation

of this statement did not escape Plaintiffs.

43.     Further confirming Defendants' intent to harass Plaintiffs and further confirming

that Mr. Rudnick and the Kirchicks were plotting together, on December 13, 2017, Mr. Rudnick

emailed his sister the sketch plan from Eldredge Surveying & Engineering dated the same date,

to which Mrs. Kirchick responded: "I'm still unclear what actions we can take regarding the land

inside of the dotted lines . . . . I know we can't impair their right of way, but can we restrict them

from their improvements? Can you paint it purple because we like purple?" A copy of this email

is attached as Exhibit 12.

44.     In mid-December, Defendants planned to meet to further develop their strategy to

coerce Plaintiffs, even though Mrs. Kirchick acknowledged Plaintiffs had a right to have planted

their pear trees.

45.     In early March 2018, Mr. Rudnick entered Plaintiffs' property without Plaintiffs'

permission, while they were not present, for the purpose of gathering information and taking

photographs to share with his co-conspirators.

46.     On March 23, 2018, the Kirchicks, through an attorney, sent Plaintiffs a certified

letter. After identifying that he represented the Kirchicks, the attorney's letter alleged that "the

trees [Plaintiffs] planted to screen [Plaintiffs'] deck have blocked [the Kirchick's] view." A copy

of the March 23, 2018 letter is attached as Exhibit 13. To be clear, the trees referenced in the

letter are the same trees that were planted in 2008 and which were the subject of Plaintiffs'

landscaping plan approved by the Kirchicks. The attorney then asserted that the fence between

the properties was located on the Kirchicks' property, as was Plaintiffs' mailbox and other

plantings. *Id.* But the Kirchicks offered an easy solution to resolve the alleged claims: the Kirchicks would allow the fence, mailbox and plantings to remain in place—as they had been for years without objection—if Plaintiffs "would remove the two right hand trees (as viewed from the Kirchicks' property) and grant them a view easement over the area where the trees are located." *Id.* The letter asked for Plaintiffs' response by April 30, 2018. *Id.*

47.     On April 11, 2018, several weeks before the Kirchicks' April 30, 2018 deadline for Plaintiffs to respond, Defendants escalated their strategy. Specifically, the Kirchicks, through their attorney, emailed Plaintiffs threatening that Defendants intended to destroy the cobblestone and rock private way utilized by Plaintiffs to access their home, and in which Plaintiffs possess legal rights, threatening to "resurface" it. The email from the Kirchicks' counsel stated: "Ron Rudnick asked me to confirm that he will be re-surfacing that portion of the private way that his sister has rights in so its use will be more durable." A copy of the April 11, 2018 email is attached as Exhibit 14. Defendants had no right to alter or destroy the private way by paving it. Defendants' threat was intended to force Plaintiffs to remove the pear trees on their property or else Defendants would damage Plaintiffs' property and the private way leading to their home.

***At the Kirchicks' Direction, Mr. Rudnick Threatened, Intimidated, and Coerced Plaintiffs By His Words and Acts After They Did Not Capitulate to the Demand to Remove Their Trees***

48.     On April 12, 2018, beginning at 4:18 p.m., Defendants further escalated their campaign. More specifically, Mr. Rudnick told Mr. Kaiser on the phone that the Kirchicks had long been upset about Plaintiffs' pear trees and that his sister, Mrs. Kirchick, was very unhappy and was making Mr. Rudnick's life miserable complaining about it. Mr. Rudnick told Mr. Kaiser that he was "very protective" of his sister, and that he was acting on behalf of the Kirchicks with respect to the pear trees. He then explicitly threatened that if Plaintiffs did not cut down the trees, Defendants would make Plaintiffs' lives "miserable" and "drive" Plaintiffs "out of town."

49.     Mr. Rudnick's' threats were especially alarming to Plaintiffs given Mr. Rudnick's well-known conviction for conspiring to violate the Controlled Substances Act by coordinating the theft of thousands of pounds of marijuana from the South Yarmouth Police Barracks. Mr. Rudnick's criminal background and reputation made these threats even more ominous.

50.     Mr. Rudnick's message to Plaintiffs during these phone calls was that Chatham was "his town." He told Mr. Kaiser that he had successfully done the same thing to others on whom he had placed a "black spot" because Mr. Rudnick did not like to be pushed around. Mr. Rudnick told Mr. Kaiser that he would only "call off the dogs" if Plaintiffs cut down the two trees which, according to Mr. Rudnick, blocked his sister's and brother-in-law's view over Plaintiffs' property. Mr. Rudnick made it clear that if Plaintiffs did not make him and his sister happy, not only would Defendants interfere with Plaintiffs at their home, but they would extend and escalate their campaign against Plaintiffs to the entire Chatham community.

51.     At approximately 9:00 p.m. that same night, Mr. Rudnick called Mr. Kaiser again to repeat that Plaintiffs needed to remove the two pear trees. Mr. Kaiser told him that Plaintiffs had already moved the agreed upon pear tree in 2011, as a courtesy to the Kirchicks and at their own expense. Mr. Rudnick repeated that Plaintiffs had better remove the trees, or he would "send the suits in" against Plaintiffs, an apparent reference to lawyers, if they did not do so. Plaintiffs understood this as a threat to use litigation to make Plaintiffs to capitulate to their demands.

52.     Shortly before 11:00 a.m. the next day, April 13, 2018, Mr. Rudnick called Mr. Kaiser and continued his threats. In the classic language of outright thuggery, Mr. Rudnick stated, among other things, that if Plaintiffs removed the two trees, he "goes away." Given the threats and to avoid further confrontation with Defendants, Mr. Kaiser offered to take down one tree, rather than the two. Mr. Rudnick immediately rejected the offer, responding that if both

pear trees were not taken down, he would take out the vegetation that Plaintiffs planted years ago and remove their U.S. mailbox. Mr. Rudnick firmly stated to Mr. Kaiser that he wanted to "make myself clear, if you do not want to do what I want you to do," he would "start tearing stuff out, like bushes and mailboxes." The message made clear the consequences Plaintiffs would suffer if they did not capitulate to Defendants demands.

53.     Approximately, twenty-five minutes later, Mrs. Kirchick emailed her husband, reiterating that if the pear trees were not taken down, they would continue to harass Plaintiffs by impeding access to Plaintiffs' home and altering the previously pleasant appearance of the private way. A copy of the April 13, 2018 email is attached as Exhibit 15. Mr. Kirchick, wrote back "Amen", and, a few minutes later replied that they will rename the private way "F—k You Grant and John Way." *Id.*

54.     At 11:41 a.m. that day, April 13, 2018, Mr. Rudnick called Mr. Kaiser again to continue Defendants' campaign to force Plaintiffs to remove the two trees. As part of their continued and coordinated effort, at 1:03 p.m. Mrs. Kirchick emailed Mr. Rudnick to reiterate that Plaintiffs had to take two trees down, not one, and reiterated the position that she and her husband wanted Mr. Rudnick to convey to Plaintiffs on their behalf, that if Plaintiffs did not take the two pear trees down, Plaintiffs' property would be destroyed. *See* April 13, 2018 email attached as Exhibit 16. She wrote, *inter alia*: "We want the two trees removed. If they insist on one tree, let's resume status quo and proceed with removing the fence and attending to the driveway. Bill and I appreciate everything that you are trying to do for us, but at some point enough is enough. . . . They should move. It would be good for them, and for us. Carol." *Id.*

55.     Almost immediately after, Mr. Rudnick texted Mr. Kaiser that Mrs. Kirchick wanted to two trees taken down.  A little over two hours later, Mr. Rudnick texted Mr. Kaiser

again reinforcing Defendants' threat to destroy Plaintiffs' property by removing their mailbox and fence and having a professional landscape company dig up other vegetation Plaintiffs' had planted.

56.     Mr. Rudnick continued to harass Mr. Kaiser by text and email that day asking where Mr. Kaiser would like Mr. Rudnick to store his property. Although Mr. Kaiser responded that he preferred to involve his attorney in the hope of reaching an amicable resolution, Mr. Rudnick ignored the offer and continued to harass him.

57.     Defendants' subsequent threats and conduct vividly demonstrate that Defendants fully intended to follow through on their threats. In the late morning on May 24, 2018, the Kirchicks, Mr. Rudnick and employees of Mr. Rudnick arrived unannounced in the private way leading to Plaintiffs' property and, over the next several hours, severely butchered and damaged the side of a mature privet lining the private way leading to Plaintiffs' home. Their purpose was malicious; it was to harass and threaten Plaintiffs and to demonstrate to them that if they did not cut down the pear trees on their own property to benefit the Kirchicks, Defendants would continue to harass them, to make their lives "miserable," as Mr. Rudnick had put it, and to severely harm Plaintiffs' use and enjoyment of their own home. This conduct caused Plaintiffs to fear for the safety of both themselves and their property.

58.     Defendants' campaign continued. Later that day on May 24, 2018, Mr. Rudnick, acting as agent for the Kirchicks, directed that his Lighthouse Realty Truck be parked in the private way to impede Plaintiffs' access and egress to their home. As Mr. Rudnick told Mr. Kaiser in April 2018, Defendants were parking his Lighthouse Realty Trucks in the private way leading to Plaintiffs' home in order to pressure Plaintiffs into cutting down their trees. Mr. Rudnick also told Mr. Kaiser that he would stop parking his Lighthouse Realty Trucks in the

private way only if Plaintiffs took down the two pear trees. Defendants had these trucks parked there every day during non-business hours and throughout weekends and holidays through June 8, 2018, all for the purpose of delivering on and reinforcing Defendants' threat to Plaintiffs in a way that landed on them – that if Plaintiffs did not cut down the two pear trees, Defendants would make their lives miserable, place them, in effect, under siege, and sharply impair their use and enjoyment of their home.

59.     On June 1, 2018, the Kirchicks' attorney informed Plaintiffs' attorney that Defendants intended to engage in further self-help and planned to destroy Plaintiffs' property. The Kirchicks' counsel stated that he was hereby providing notice that his clients intend to remove vegetation on June 8, 2018.

### Plaintiffs Report Defendants Conduct to the Chatham Police and Obtain a Harassment Protection Order Against Defendants

60.     Concerned that Defendants' threats would escalate into physical violence, Plaintiffs met with Chatham Chief of Police Mark Pawlina and Sergeant William Glover on June 6, 2018. Mr. Rudnick had previously told Plaintiffs in April 2018 that he had already informed the Chatham police about Plaintiffs, and that the police had approved of his and the Kirchicks' actions against Plaintiffs. Mr. Rudnick also told Plaintiffs that the Chatham Town Manager supported the actions directed against Plaintiffs. These representations were intended to threaten, intimidate, and coerce Plaintiffs, and to place them in fear. Sergeant Glover recommended that Plaintiffs seek a Harassment Prevention Order against Defendants pursuant to G.L. c. 258E.

61.     On June 7, 2018, at 1:17 p.m., Mr. Rudnick asked Mrs. Kirchick how she liked the result of Plaintiffs' re-positioning of the fence separating their property from the Kirchicks', undertaken in response to Defendants' demand. *See* June 7, 2018 email attached as Exhibit 17. Mrs. Kirchick responded to Mr. Rudnick that it was "[t]ime for the truck." *Id.* Mrs. Kirchick's

statement referred to Defendants' use of Lighthouse Realty Trucks to block and/or impede the private way leading to Plaintiffs' home as part of the campaign of threats, intimidation and coercion.

62.     By approximately 4 p.m. that same day, and as directed, Mr. Rudnick did indeed have another Lighthouse Realty Truck parked inside the private way to apply pressure. Within an hour, Plaintiffs' attorney contacted the Kirchicks' attorney and informed him of what was obvious – the truck parked in the way had been received as a message of further pressure, coercion, and an act of bad faith. This was, of course, precisely what Defendants intended.

63.     As recommended by the Chatham Police, on June 8, 2018, Mr. Kaiser filed a complaint for protection from harassment pursuant to G.L. c. 258E against the Kirchicks and Mr. Rudnick in Orleans District Court. An *ex parte* evidentiary hearing was held, and the Orleans District Court (Welsh, J.) granted the Order against all three Defendants.

64.     The Chapter 258E Orders, which were obtained urgently *ex parte*, were set to expire within 10 days, or June 18, 2018. The Kirchicks and Mr. Rudnick each requested to delay the scheduled hearing, thus extending the orders as to the Kirchicks until July 2, 2018, and as to Mr. Rudnick until July 17, 2018.

65.     On July 2, 2018, instead of going forward on the hearing to extend the Harassment Prevention Orders against them, the Kirchicks agreed effectively to voluntarily extend the Chapter 258E Orders against them for an additional 60 days by agreeing not to remove any vegetation and to not park in the private way. A stipulation to that effect was signed and endorsed by the Court.

66.     Following a hearing on July 17, 2018, the Court declined to extend the Chapter 258E Order against Mr. Rudnick, indicating that the parties could pursue their remedies through

civil litigation. As they were leaving the courtroom after the hearing, Mr. Rudnick said to

Plaintiffs, "Now the fun begins." Plaintiffs interpreted this statement as an obvious threat that

Defendants' intimidation and coercion campaign against Plaintiffs would become even more

constant, more intense, and more damaging.

### *In Retaliation for Obtaining the Harassment Protection Orders, Defendants Used Town of Chatham Resources, Local Police, and the Superior Court to Continue Their Campaign of Harassment*

67.     Defendants supplemented and escalated their campaign of threats, coercion, and

intimidation by filing lawsuits and other actions against Plaintiffs for disputes they

manufactured, which were without reasonable basis in law or fact and which were filed for the

unlawful and improper purpose of coercing Plaintiffs into either cutting down the trees or

imposing economic pressure and making their lives so "miserable," as Defendants put it, such

that Plaintiffs would sell their property and leave Chatham. Defendants' actions described in

more detail below, include, without limitation: 1) causing the police to issue numerous no-

trespass orders against Mr. Kaiser; 2) filing multiple permit applications with the ZBA for a

"mother-in-law" apartment that would have negative implications on Plaintiffs' home (that was

ultimately denied) and repeatedly postponing the ZBA hearings on the matter so Plaintiffs would

have to make multiple trips from Texas to Chatham during the off-season; and 3) by pursuing a

meritless action in the Superior Court from which the Kirchick's claims have been dismissed

based on the Kirchick's failure to comply with their discovery obligations.

68.     For example, and without limitation, on July 26, 2018, just nine (9) days after Mr.

Rudnick said "now the fun beings," Defendants filed a request for a special permit with the

Chatham Zoning Board of Appeals in an attempt to claim some authority to pave over – that is,

destroy – the cobble and rock private way providing access to Plaintiffs' home, remove

Plaintiffs' mailbox and remove several mature trees that provide privacy for Plaintiffs' home. Mr. Rudnick had repeatedly told Plaintiffs that he had connections to and special influence over Town of Chatham zoning officials and would use it to prevent Plaintiffs from obtaining approval of anything they might seek to do.

69.     Another example is that on the same day Defendants filed their ZBA permit application, the Kirchicks filed a lawsuit against Plaintiffs, in Barnstable Superior Court, in a case styled *Kirchick et al. v. Kaiser et al.*, Docket No. 1872CV00397, alleging, among other things, abuse of process (in connection with the Temporary Harassment Prevention Orders issued against them by the Orleans District Court) and trespass. This lawsuit was yet another tactic to force Plaintiffs to capitulate.

70.     After filing the Superior Court lawsuit, the Kirchicks' attorney emailed Mrs. Kirchick celebrating their filing, aimed at putting further pressure on Plaintiffs, stating, *inter alia*, "If you have a flagpole, you may want to start flying the Jolly Roger. I'm sure it will not bother them at all." *See* July 26, 2018 email attached as <u>Exhibit 18</u>. Mrs. Kirchick responded, "We've been meaning to buy a flagpole! Now sounds like the right time." *Id*. Two minutes later, Mr. Rudnick emailed Mrs. Kirchick stating, "The fun begins remember I said that to him." Mrs. Kirchick replied: "Yup!" and included a smiling emoji. *Id.*

71.     The Barnstable Superior Court ultimately entered a default judgment in Plaintiffs' favor as a result of the Kirchicks' failure to comply with their discovery obligations under the Massachusetts Superior Court Rules. The Kirchicks filed multiple motions seeking to persuade the Superior Court to vacate its order of final default judgment, each of which was rejected by the Superior Court as without merit. The Kirchicks chose not to appeal the Superior Court's

ruling and conceded that, "such an appeal had no chance of success." The Kirchicks' meritless

lawsuit caused Plaintiffs to suffer severe emotional distress and economic damage.

### *As Part of Defendants' Plan, Mr. Rudnick, Acting on the Kirchicks' behalf, Instructed His Commercial Tenants and Other Businesses to Obtain "No Trespass" Orders Prohibiting Mr. Kaiser from Entering Numerous Retail and Dining Establishments in Chatham*

72.     On July 31, 2018, five (5) days after the Kirchicks sued Plaintiffs, Mr. Rudnick,

in furtherance of Defendants' goals and making good on his April 2018 threats, solicited, and

caused to issue numerous "no trespass" orders prohibiting Mr. Kaiser, and as a practical matter

his husband, Mr. Furnish, from visiting retail establishments in Chatham. Defendants used Mr.

Rudnick's influence and coordinated an effort to cause numerous Chatham restaurants, stores

and other retail establishments that are otherwise open to the public to issue notices against Mr.

Kaiser pursuant to G.L. c. 266 § 120, warning him not to ever again enter these properties, or

risk arrest and imprisonment. Mr. Rudnick, who owns significant commercial real estate in

Chatham, instructed local businesses that rented space from him, and others, to sign "no

trespass" orders to forbid Mr. Kaiser from coming onto their premises. Mr. Rudnick then

arranged for the Chatham Police department to serve the orders on Mr. Kaiser, for extra effect.

73.     Within two (2) days, on August 2, 2018, Mr. Rudnick obtained a second batch of

no trespass orders against Mr. Kaiser and delivered them to the Chatham Police to serve them on

Mr. Kaiser. The Chatham Police served the new batch of no trespass orders on Mr. Kaiser the

same day.

74.     As a result of being served with numerous no trespass orders, Plaintiffs were

permanently barred from entering numerous establishments open to the general public, which

include, without limitation, Delmar Restaurant, Bistro Restaurant and Raw Bar, Sandi's Diner,

Carmine's Pizza, Focus Gallery, Ports & Company, the Chatham Liquor Locker, Lighthouse

Realty, parking lots, and virtually every other establishment located in the middle of downtown

Chatham that is part of the 595 Main Street complex. Many of these establishments were located

on land managed by and/or in which Mr. Rudnick holds an ownership interest, through various

real estate companies. Defendants' issuance of these no trespass orders to Mr. Kaiser, which

practically implicates his husband, is especially intimidating to a same-sex couple that faces

discrimination. The orders were calculated to interfere with their right to live a normal life in

Chatham by improper threats of physical coercion via a threat of arrest and imprisonment if they

enter establishments which are otherwise open to the general public.

75.     Mr. Rudnick also used his influence to cause the executive director of the

nonprofit community Chatham Orpheum Theater to sign an order prohibiting Mr. Kaiser, a

donor to the organization, from ever again going to the local movie house. Because Mr. Rudnick

has no ownership interest in the Orpheum Theater or in the land on which it is located, the

Chatham police declined to serve it on Mr. Kaiser, deeming it ineffective.

76.     Defendants' coercion, harassment and intimidation of Plaintiffs by barring them

from ever again utilizing restaurants, stores and other establishments in Chatham has caused and

continues to cause Plaintiffs severe emotional distress. Indeed, the "no-trespass" orders were

intentionally designed to publicly humiliate Plaintiffs, to exclude Plaintiffs, and to impose severe

emotional distress on them while curtailing the use and enjoyment of their property in Chatham.

These orders have not been withdrawn and remain in effect as of this filing.

### *Defendants Have Continued to Carry Out Their Plan of Attack Designed to Threaten, Intimidate, and Coerce Plaintiffs into Selling Their Home and/or Leaving Chatham*

77.     Consistent with Defendants' creating and implementing their plan of attack, and

consistent with Mr. Rudnick's bragging about having an arsenal of tactics he had used in the past

to successfully intimidate and coerce others, Defendants continued over the ensuing months to

make good on their threat to use these tactics against Plaintiffs. Examples of Defendants'

conduct include, without limitation, the following:

a.   On multiple occasions, Mr. Rudnick has personally stalked Plaintiffs' home and property from all sides and was at and near Plaintiffs' home taking photographs and talking on his phone, all when he had no legitimate reason to be there.

b.   Mr. Rudnick and Mrs. Kirchick took photographs of Plaintiffs' home and of Plaintiffs working in their yard. Mr. Rudnick and Mrs. Kirchick even used a golf cart from the local golf course—not to play golf—but to approach Plaintiffs' property from the backyard.

c.   Mr. Rudnick regularly drove his uniquely identifiable car to the front of Plaintiffs' property, sometimes to just sit in his car watching, and other times getting out of his car and lurking in the area—making it clear that his presence was known and sending the message that he was watching and monitoring Plaintiffs.

d.   On September 4, 2018, just four days after the extended Harassment Prevention Orders against the Kirchicks expired, Mrs. Kirchick and Mr. Rudnick gathered once again in the private way and directed his employees to severely butcher, cutback, and damage the side of the privet lining the private way leading to Plaintiffs' home.

e.   Defendants regularly interfered with Plaintiffs' service providers who were just trying to do their job, intimidating them by repeatedly approaching them and photographing them as if they had done something wrong. Defendants made the workers feel uneasy and fearful. Defendants first started harassing the workers in the private way leading to Plaintiffs' home. When the workers relocated their equipment to the private road behind Plaintiffs' home to escape Defendants' interference, Mr. Rudnick followed them, trespassing upon private property to continue their intimidation tactics.

f.   Defendants continued periodically to park vehicles in the private way leading to Plaintiffs' home to impede Plaintiffs' (and their service providers') ingress and egress to their home.

g.   The Kirchicks' attorney sent an email to the Kirchicks on March 29, 2019, confirming that one of the concrete bounds erected for the purpose of designating the boundary of Plaintiffs' property had been illegally removed. Plaintiffs did not authorize or request removal of the bound.

h.   Defendants filed a specious complaint on June 11, 2019, claiming that Plaintiffs had violated the Special Permit they obtained in 2011 in connection with configuring the parking area in front of their house. Defendants' filing was yet another attempt to frustrate and impose additional costs on Plaintiffs. Instead of

litigating the frivolous matter, Plaintiffs reconfigured the parking area at a lesser, but substantial cost.

i.  On July 23, 2019, while Plaintiffs were in their home, Mr. Rudnick brazenly walked up the private way leading to Plaintiffs' home and into their backyard to examine the pear trees Defendants want to cut down. Mr. Rudnick did not have Plaintiffs' permission to enter their property.

j.  Seven (7) days later, in a letter dated August 1, 2019, Mr. Kirchick and Mrs. Kirchick issued another no trespass notice, this time to both Plaintiffs. The notice cited G.L. c. 266 § 120, again threatening Plaintiffs with the risk of arrest and imprisonment.

k.  Eighteen days later, on the morning of August 18, 2019, Mr. Kirchick inexplicably and repeatedly trespassed on Plaintiffs' property by bringing orange traffic cones onto Plaintiffs' property, placing the cones there, removing them and then replacing them there, doing so multiple times.

78.     Defendants' pattern of conduct over multiple years has continued. It has been and remains intended to, and did in fact, harm Plaintiffs, including without limitation, interfering with Plaintiffs' use and enjoyment of their home and property, causing them to fear for the safety of their persons and property, causing loss of enjoyment of life, and causing severe emotional distress.

79.     As of the date of this filing, Defendants have not retracted their threats, have not apologized for their conduct, and have given no indication that they will stop their endless campaign to intimidate, coerce, threaten and harass Plaintiffs into cutting their trees down or be run out of Chatham. Plaintiffs now seek the Court's assistance to stop Defendants' pattern of tortious conduct.

## Count One

## (VIOLATION OF G.L. c. 12 §§ 11H, 11*I*, 11J, AND ARTICLES I, X AND XII OF THE MASSACHUSETTS DECLARATION OF RIGHTS)

80.     The allegations set forth above are re-alleged and incorporated herein by reference.

81.     Plaintiffs enjoy a secured right to live their lives free from threats, intimidation and coercion in the exercise of the right to acquire, possess, improve, and use and enjoy their home and property. Plaintiffs also enjoy a secured right to enjoy public establishments without fear of discrimination, threats, intimidation or coercion. Their rights are constitutionally secured by, among other laws, Articles I, X, and XII of the Massachusetts Declaration of Rights and the Fourteenth Amendment to the United States Constitution, and include the right to access public accommodations, advantages, facilities, and privileges of any place of public accommodation as set forth in G.L. c. 272, §§ 92 and 98.

82.     Defendants have violated Plaintiffs' rights. Defendants, individually, and in concert with each other, have engaged in a nearly three (3) year pattern of threats, intimidation, harassment, coercion and defamation, and in doing so have violated the Massachusetts Civil Rights Act, G.L. c. 12 §§ 11H, 11*I*, 11J, as a result of which Plaintiffs have been damaged.

83.     Defendants' conduct has been outrageous, malicious, intentional, and deliberate, and admittedly designed to harm Plaintiffs.

## Count Two

## (DEFAMATION)

84.     The allegations set forth above are re-alleged and incorporated herein by reference.

85.     Defendants, in concert, knowingly and intentionally, and falsely, published to a substantial portion of the Chatham community that Mr. Kaiser, and by innuendo Mr. Furnish, had engaged in bad behavior sufficient to warrant the issuance of no trespass orders. Although the precise words used by Mr. Rudnick are currently unknown they would have necessarily included false and defamatory statements of and concerning Plaintiffs sufficient to cause persons

who do not know Plaintiffs to bar them from their premises. Defendants published their defamations of and concerning Plaintiffs despite knowing that Plaintiffs had not engaged in any behavior which would justify the issuance of a no trespass order. In so doing, Defendants caused Plaintiffs to be held up to public scorn and ridicule and damaged their reputations, all of which has caused Plaintiffs damages for which Defendants are liable.

<strong><u>Count Three</u></strong>

<strong>(INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)</strong>

86.     The allegations set forth above are re-alleged and incorporated herein by reference.

87.     By their actions, Defendants intended to and in fact did cause Plaintiffs emotional distress. Defendants' conduct was and remains extreme and outrageous. Defendants specifically designed a "plan for the attack" to make Plaintiffs lives "miserable" and then followed through on their plan memorializing it in their only later discovered communications.

88.     Defendants caused Plaintiffs to suffer severe emotional distress for which Defendants are liable in damages.

<strong><u>Count Four</u></strong>

<strong>(CONSPIRACY)</strong>

89.     The allegations set forth above are re-alleged and incorporated herein by reference.

90.     Defendants joined together to act in concert and by agreement over the course of several years for the unlawful purpose of threatening, intimidating, harassing and coercing Plaintiffs into doing something that Plaintiffs had no obligation or requirement to do – namely, remove trees from Plaintiffs' own property. Defendants used their unique power in combination

with each other to extort Plaintiffs into doing what they wanted. The message from Defendants was clear – either you take down the trees as we wish or we will harm you by any means necessary, whether unlawful or otherwise.

91.     In so doing, Defendants engaged in an unlawful conspiracy as a result of which they caused Plaintiffs substantial damages for which they are liable.

## Count Five

### (ABUSE OF PROCESS)

92.     The allegations set forth above are re-alleged and incorporated herein by reference.

93.     In numerous proceedings, Defendants have filed various actions without basis in fact or law, including, without limitation, causing the police to issue meritless no-trespass orders against Mr. Kaiser, filing multiple applications for special permits with the ZBA to cause Plaintiffs to repeatedly travel to Massachusetts from Texas to appear for hearings that would be cancelled at the last minute, and filing an action in the Superior Court but then refusing to comply with their discovery obligations. Defendants took such actions for the ulterior or illegitimate purpose of harassing Plaintiffs into either cutting down their trees, selling their home, or leaving Chatham altogether, which has caused Plaintiffs significant damage.

## Prayer for Relief

**WHEREFORE**, Plaintiffs, Grant Kaiser and John Furnish, respectfully request that the Court grant them the following relief:

> i.     Enter judgment in favor of Plaintiffs and against Defendants on each of the Counts asserted herein, and award them all damages allowed by law and as determined by a jury, as well as statutory interest;

ii.     Award their attorneys' fees and costs, including but not limited to pursuant to G.L. c. 12, § 11*I*, the Massachusetts Civil Rights Act;

iii.    Award their attorney's fees for bringing and prosecuting this case, and, if necessary, appellate attorneys' fees, including but not limited to pursuant to G.L. c. 12, § 11*I*, the Massachusetts Civil Rights Act, for having to bring this claim to defend against Defendants' attacks;

iv.     Issue a permanent injunction against Defendants enjoining them from further threatening, intimidating, harassing or coercing Plaintiffs; and

v.      Grant Plaintiffs such other and further relief as is just and warranted.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all counts so triable.


Respectfully submitted,

GRANT KAISER and JOHN FURNISH,

By their attorneys,


/s/ Howard M. Cooper
Howard M. Cooper (BBO # 543842)
hcooper@toddweld.com
Elizabeth E. Olien (BBO # 689350)
eolien@toddweld.com
Todd & Weld LLP
One Federal Street, 27th Floor
Boston, MA 02109
Dated: April 9, 2021                          T: 617-720-2626