**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

GRANT KAISER and JOHN FURNISH,

        Plaintiffs,

v.

WILLIAM DEAN KIRCHICK, CAROL
RUDNICK KIRCHICK, individually and as
TRUSTEE of the 41 SEAVIEW TERRACE
REAL ESTATE TRUST, and RONALD
STEVEN RUDNICK,

        Defendants.

Civil Action No. 21-cv-10590

<u>**PLAINTIFFS GRANT KAISER AND JOHN FURNISHS' MEMORANDUM IN
OPPOSITION TO DEFENDANTS WILLIAM DEAN KIRCHICK AND CAROL
RUDNICK KIRCHICKS' MOTION TO DISMISS**</u>

1

i.   **Introduction**

Plaintiffs Grant Kaiser and John Furnish have suffered an outrageous series of intentional wrongs perpetrated upon them by Defendants. What seemingly started as an issue about two pear trees, thereafter devolved into Defendants' obsessive hatred of Plaintiffs and a long-running campaign which can be explained only by Defendants' irrational and deep-seated hatred for the same-sex couple next-door. Indeed, it defies logic that anyone would spend so much time, energy, money, and involve the greater Chatham community, simply to pursue a better view from a guest bedroom in a sporadically used second home without some other motive.

Defendants now seek to raise a hodge-podge of arguments in order to obtain partial dismissal of limited counts which will not affect whether this matter proceeds nor the scope of discovery. For this reason alone, Defendants' arguments are better addressed at summary judgment based upon a full record, although to the extent the court considers Defendants' arguments now, they are entirely without merit. The Defendants have fallen woefully short of meeting their burden of establishing that the claims at issue are based "solely" on their petitioning activity. The only evidence submitted in support of either of their motions is, the complaint in this action, the complaint and docket in one of the frivolous Superior Court cases Defendants filed against the Plaintiffs, and one barebones, conclusory, nine-paragraph affidavit from Defendant Ronald Steven Rudnick – a witness who has been specifically found not to be credible by other courts.[1] In contrast, the Plaintiffs have provided ample support for their assertions that the claims are not solely based on petitioning activity, that the Defendants' underlying conduct was not factually or legally supported, and that the claims here were not brought to chill legitimate petitioning activity, i.e., they were not retaliatory. Thus, the claims should not be dismissed under the Massachusetts anti-SLAPP statute. Moreover, the Kirchicks have each failed to demonstrate that they do not have fair notice of Plaintiffs' claims, and their Rule 12(b)(6) motion should be denied.

---

[1] See, e.g., Mitchell v. Morin, 2011 WL 9374943, at *2 n.2 (Mass.Super. Nov. 17, 2011) ("[Rudnick's] testimony was not found to be credible").

### ii.     Facts

The facts of this case are remarkable, not just because of how extremely and disproportionately Defendants acted in what was initially a small dispute over shrubbery, but also because of the overwhelming amount of corroborating evidence – in Defendants' own words – of their intentions and their motives for engaging in their outrageous behavior. The Defendants' email communications between one another, which were obtained through discovery undertaken in connection with one of their frivolous lawsuits, reveal the startling lengths to which they went to implement a concerted campaign of harassment against Plaintiffs.

**The Plaintiffs' Pear Trees**

In July 2008, Plaintiffs purchased 39 Seaview Terrace in Chatham, Massachusetts, one of four homes in a private sub-division named Seaview Terrace. Compl. ¶ 18. Defendants William and Carol Kirchick have owned 41 Seaview Terrace, in their names, or through the 41 Seaview Terrace Real Estate Trust, since 1999. Id. ¶ 19. Defendant Ronald Rudnick is Mrs. Kirchick's brother. Id. ¶ 1.

In December 2008, Plaintiffs reached out to the Kirchicks to discuss trees planted by the builder of their home along the fence line between 39 and 41 Seaview Terrace and thereafter shared with them a landscaping plan prepared by a professional architect. Id. ¶ 21. The Kirchicks responded that they were delighted by Plaintiffs actions to accommodate them and that they approved of Plaintiffs' plan. Id. ¶ 21, Ex. 1.

Years followed with no word or complaint from the Kirchicks about the trees Id. ¶ 22. However, that changed in 2017, when the Kirchicks decided that they wanted Plaintiffs to remove two mature pear trees from Plaintiffs' yard in order to improve the Kirchicks view from a guest bedroom in the back of their house. Id. ¶ 23.

On August 12, 2017, Mr. Kaiser met with the Kirchicks, and they asked him to cut down two of the pear trees. Id. ¶ 25. Despite having no legal obligation to move the trees, Plaintiffs consulted with landscape professionals about what options might be available. Id. ¶ 26. However, just nine days later, before Plaintiffs could complete their investigation, Defendants

began their campaign of non-legal ways to force Plaintiffs to remove the trees. Id. ¶ 27.

**Defendants Begin their Harassment Campaign**

Beginning in August 2017, on Mrs. Kirchick's instruction, Rudnick began directing employees of a company which he either owns or controls, to park commercial trucks displaying the Lighthouse Realty Property Management logo, at the entrance of the private way leading to Plaintiffs' home, which is the sole means of accessing Plaintiffs' home, for weeks at a time. Id. ¶¶ 30-32, 36-38. The purpose of doing so was to send a message to Plaintiffs that life would become unpleasant for them if they did not capitulate to Defendants' demands,[2] and indeed, the Defendants privately emailed each other expressing satisfaction that the placement of the truck resulted in Plaintiffs' landscapers having trouble getting their truck in the private way leading to Plaintiffs' home.[3] Id. ¶ 35.

By September 12, 2017, the Lighthouse Realty Truck had been parked at the entrance of the private way leading to Plaintiff's home for more than three weeks without being moved. Mr. Kaiser politely let the Kirchicks know as much by contacting them to alert them to the fact that if the truck was supposed to be there in connection with work being done on the Kirchicks' home (of course, it wasn't, and there wasn't any work being done on the home), the Kirchicks should know there had not been any workers at their home.  Id. ¶ 38, Ex. 8., In response, Mr. Kirchick lied, stating "the work should be done by the 23rd but if not, my brother-in-law thinks it should be done by the end of the month." Id. ¶ 39, Exs. 8, 9. Secretly, the Defendants expressed concern that Plaintiffs were not sufficiently getting the right message from the Lighthouse Realty Truck parked at the entrance of the private way which was intended to pressure them.[4] Id. ¶ 37, Ex. 7.

---

[2] Referring to his placement of the truck, Mrs. Kirchick told Rudnick to "start planting in the flatbed" and wrote "Thanks, Ron. I really appreciate it. It's disappointing . . . that these guys are such jerks…. I hate when people do shit just because they can without regard to how it affects anyone else. Selfish bastards." See Compl. Exs. 3, 4.
[3] Mrs. Kirchick wrote her husband and her brother, "By the way, they had trouble getting the truck in the driveway," putting a "smile" emoji after the word "driveway" to express her satisfaction with this result. Compl. Ex. 6.
[4] Mr. Kirchick wrote: "So he [Kaiser] thinks the truck is parked there to do work on our house???" Compl. Ex. 7. Mrs. Kirchick promptly forwarded the message to her brother, Rudnick. Id. Before Mr. Kirchick had responded to Mr. Kaiser, Mrs. Kirchick proposed writing: "Does the truck bother you even though it doesn't affect your enjoyment of your property? Now you know what those damn trees are doing to us." Compl. Ex. 8. Mr. Kirchick emailed his wife and suggested she add, "you fargin axels" to the end of the sentence. Id.

On March 23, 2018, shortly after Rudnick entered Plaintiffs' property without Plaintiffs' permission, while they were not present, to take photographs, the Kirchicks' attorney sent Plaintiffs a certified letter asserting that the fence between Plaintiffs' and the Kirchicks' properties was over the property line and Plaintiffs' mailbox, and other plantings – which had all been in place for years without objection – were on property the Kirchicks' now claimed to own. Id. ¶¶ 45-46, Ex. 13. The Kirchicks offered to drop these claims if Plaintiffs, in exchange, "would remove the two right hand trees…and grant them a view easement over the area where the trees are located." Id.

On April 11, 2018, several weeks before the deadline laid out in the letter for Plaintiffs to respond, Defendants escalated their strategy by having their attorney email Plaintiffs threatening to destroy and "resurface" the cobblestone and rock private way utilized by Plaintiffs to access their home and in which Plaintiffs possess legal rights. Id. ¶ 47, Ex. 14. This threat followed months of the Defendants privately considering whether their "plan for the attack" against Plaintiffs should include removing the cobblestones and placing them on Plaintiffs' porch,[5] painting the private way purple, and restricting Plaintiffs from maintaining and making improvements on the portion of the private way in which they have legal rights.[6] Id. ¶¶ 40-43, Exs. 10-12. Although it is impossible to know Defendants' motivation in planning to paint a portion of the way purple, the homophobic connotation was not lost on Plaintiffs. Id.

**At the Kirchicks' Direction, Rudnick Threatens and Intimidates Plaintiffs**

In April 2018, Rudnick repeatedly called, emailed, and texted Mr. Kaiser to threaten and intimidate the Plaintiffs. In their private contemporaneous emails, Defendants made clear that Rudnick's calls, texts, emails, and threats were part of a coordinated attempt to coerce Plaintiffs

---

[5] Mrs. Kirchick suggested they could "write to the jerks and say we are removing the cobblestones on our property and where would they like them?" Compl. Ex. 11.

[6] On December 13, 2017, Rudnick emailed his sister the sketch plan from their surveyor, to which Mrs. Kirchick responded: "I'm still unclear what actions we can take regarding the land inside of the dotted lines . . . . I know we can't impair their right of way, but can we restrict them from their improvements? Can you paint it purple because we like purple?" Id. ¶ 43, Ex. 12.

to remove the trees or leave town.[7] Id. ¶¶ 48-56. The details of these threatening communications are more fully laid out in the Complaint and in the Plaintiffs' Opposition to Rudnick's Motion to Dismiss. In summary, Rudnick made clear that the trucks had been parked in the private way in order to pressure Plaintiffs to cut down the trees and threatened to make Plaintiffs' lives "miserable" and "drive" Plaintiffs "out of town." Id. ¶¶ 48-58.

On May 24, 2018, Defendants followed through on their threats. Id. ¶ 57. That morning, the Kirchicks, Rudnick, and Rudnick's employees arrived unannounced in the private way leading to Plaintiffs' property and, over the next several hours, severely butchered and damaged the side of a mature privet lining the private way leading to Plaintiffs' home. Id. This conduct caused Plaintiffs to fear for the safety of both themselves and their property. Id.

Later that day, Rudnick, on behalf of the Kirchicks, once again directed that his Lighthouse Realty Truck be parked in the private way to impede Plaintiffs' access and egress to their home. Id. ¶ 58. Defendants had these trucks parked there every day during non-business hours and throughout weekends and holidays through June 8, 2018. Id.

On June 1, 2018, the Kirchicks' attorney informed Plaintiffs' attorney that Defendants intended to engage in further self-help and planned to destroy Plaintiffs' property by removing more vegetation on June 8, 2018. Id. ¶ 59. That same week, the Plaintiffs finished repositioning the fence separating their property from the Kirchicks'. Id. ¶ 61. On June 7, 2018, at 1:17 p.m., Rudnick asked Mrs. Kirchick what she thought about the fence that Plaintiffs had repositioned as requested by the Defendants, and Mrs. Kirchick, still not satisfied, responded that it was, once again, "[t]ime for the truck." Id. ¶ 61, Ex. 17. By approximately 4 p.m. that same day, Rudnick did indeed have another Lighthouse Realty Truck parked inside the private way. Id. ¶ 62.

---

[7] Mrs. Kirchick emailed her husband, reiterating that if the pear trees were not taken down, they would continue to harass Plaintiffs by impeding access to Plaintiffs' home and altering the private way. Compl. Ex. 15. Mr. Kirchick, wrote back "Amen", and, a few minutes later replied that they will rename the private way "F—k You Grant and John Way." Id. Later the same day, Mrs. Kirchick emailed Rudnick to reiterate "We want the two trees removed. If they insist on one tree, let's resume status quo and proceed with removing the fence and attending to the driveway. Bill and I appreciate everything that you are trying to do for us, but at some point enough is enough…. They should move. It would be good for them, and for us. Carol." Ex. 16.

5

**Plaintiffs Obtain Harassment Protection Orders Against Defendants**

On June 6, 2018, concerned that Defendants' actions would escalate into physical violence, Plaintiffs met with Chatham Police, who recommended that Plaintiffs seek Harassment Prevention Orders ("HPOs") against Defendants pursuant to G.L. c. 258E. Id. ¶ 60. On June 8, 2018, Mr. Kaiser filed complaints for HPOs against all three Defendants, which the court granted following an urgent *ex parte* evidentiary hearing. Id. ¶ 63.

On July 2, 2018, instead of going forward on the two-party hearing to extend the HPOs against them, the Kirchicks offered to voluntarily extend the restrictions of the Chapter 258E Orders against them for an additional 60 days by agreeing not to remove any vegetation and to not park in the private way. Id. ¶ 65. Following a two-party hearing on July 17, 2018, concerning the order against Rudnick, the Court declined to extend the order against him, indicating that the parties could pursue their remedies through civil litigation. Id. ¶ 66. As they were leaving the courtroom, Rudnick said to Plaintiffs, "Now the fun begins." Id. Plaintiffs interpreted this statement as an obvious threat that Defendants' intimidation and coercion campaign against Plaintiffs would become even more constant, more intense, and more damaging. Id.

**Defendants Use Town of Chatham Resources, Local Police, and the Superior Court to Continue Their Campaign of Harassment**

Defendants supplemented and escalated their campaign of threats, coercion, and intimidation by filing lawsuits and other actions against Plaintiffs for disputes they manufactured, which were without reasonable basis in law or fact and which were filed for the improper purpose of coercing Plaintiffs into either cutting down the trees or leaving Chatham. Id. ¶ 67.

On July 26, 2018, just nine days after Rudnick said "now the fun beings," Defendants sought a special permit from the Chatham Zoning Board of Appeals in an attempt to claim some authority to pave over – that is, destroy – the cobble and rock private way providing access to Plaintiffs' home, remove Plaintiffs' mailbox, and remove several mature trees that provide privacy for Plaintiffs' home. Id. ¶ 68. Rudnick had repeatedly told Plaintiffs that he had

6

connections to and special influence over Town of Chatham zoning officials and would use it to prevent Plaintiffs from obtaining approval of anything they might seek to do. Id.

On the same day Defendants sought their ZBA permit application, the Kirchicks sued Plaintiffs, in Barnstable Superior Court, in a case styled Kirchick et al. v. Kaiser et al., Docket No. 1872CV00397, alleging, among other things, that seeking the HPOs were somehow an abuse of process, and for trespass. Id. ¶ 69. As reflected in their private communications, this lawsuit was yet another tactic to coerce Plaintiffs to capitulate.[8] Id. ¶ 70. The Kirchicks failed to comply with their discovery obligations in the case, and the Barnstable Superior Court ultimately dismissed the Kirchicks' claims. Id. ¶ 71. The Kirchicks' meritless lawsuit, filed for improper reasons, caused Plaintiffs to suffer severe emotional distress and economic damage. Id.

On July 31, 2018, five days after the Kirchicks sued Plaintiffs, Rudnick, a developer who owns significant commercial real estate in Chatham, instructed local businesses that rented space from him, and others, to sign "no trespass" orders pursuant to G.L. c. 266, § 120, to forbid Mr. Kaiser, and as a practical matter his husband, Mr. Furnish, from coming onto their premises. Id. ¶ 72. Rudnick then arranged for the Chatham Police department to serve the orders on Mr. Kaiser, for extra effect. Id. Within two days, Rudnick obtained and had the Chatham Police serve a second batch of no-trespass orders on Mr. Kaiser. Id. ¶ 73.

Although the precise words used by Rudnick to obtain these orders are currently unknown they would have necessarily included false and defamatory statements of and concerning Plaintiffs sufficient to cause persons who do not know Plaintiffs to bar them from their premises. Id. ¶ 85. He made these statements despite knowing that Plaintiffs had not engaged in any behavior which would constitute good cause to issue a no trespass order. Id.

As a result of being served with numerous no trespass orders, Plaintiffs were permanently

---

[8] After filing the Superior Court lawsuit, the Kirchicks' attorney emailed Mrs. Kirchick celebrating their filing, stating "If you have a flagpole, you may want to start flying the Jolly Roger. I'm sure it will not bother them at all." Compl. Ex. 18. Mrs. Kirchick responded, "We've been meaning to buy a flagpole! Now sounds like the right time." Id. Two minutes later, Rudnick emailed Mrs. Kirchick stating, "The fun begins remember I said that to him." Id. Mrs. Kirchick replied: "Yup!" and included a smiling emoji. Id.

barred from entering numerous establishments open to the general public, which include, without limitation, Delmar Restaurant, Bistro Restaurant and Raw Bar, Sandi's Diner, Carmine's Pizza, Focus Gallery, Ports & Company, the Chatham Liquor Locker, Lighthouse Realty, parking lots, and virtually every other establishment located in the middle of downtown Chatham that is part of the 595 Main Street complex. Id. ¶ 74. Defendants' issuance of these no trespass orders to Mr. Kaiser, which practically implicates his husband, is especially intimidating to a same-sex couple that faces discrimination. Id. The orders were calculated to interfere with their right to live a normal life in Chatham by improper threats of physical coercion via a threat of arrest and imprisonment if they enter establishments which are otherwise open to the general public. Id.

Defendants' coercion, harassment, and intimidation of Plaintiffs by barring them from ever again utilizing restaurants, stores and other establishments in Chatham has caused and continues to cause Plaintiffs severe emotional distress, while curtailing the use and enjoyment of their property in Chatham. Id. ¶ 76. These orders remain in effect today. Id.

**Defendants Continue to Carry Out Their Plan of Attack Designed to Threaten, Intimidate, and Coerce Plaintiffs into Selling Their Home and/or Leaving Chatham**

Defendants continued over the ensuing months to use these intimidation tactics against Plaintiffs. Id. ¶ 77. Examples of Defendants' conduct include, without limitation, the following: trespassing on, stalking, and taking photographs of Plaintiffs' property; directing Rudnick's employees once again to severely butcher the side of the privet lining the private way leading to Plaintiffs' home just four days after the expiration of the HPOs against the Kirchicks; regularly interfering with, intimidating, and harassing Plaintiffs' service providers, including by trespassing on private property to do so; parking vehicles in the private way to impede Plaintiffs' (and their service providers') ingress and egress to their home; filing a specious complaint claiming that Plaintiffs had violated the Special Permit they had obtained in 2011 in connection with configuring the parking area in front of their house, forcing Plaintiffs to reconfigure the parking area rather than spend exorbitant amounts of money to appeal; and issuing another no trespass notice, this time to both Plaintiffs, from the Kirchicks. Id. Defendants' ongoing pattern

of conduct over multiple years has harmed Plaintiffs by interfering with their use and enjoyment of their home and property, causing them to fear for the safety of their persons and property, causing loss of enjoyment of life, and causing severe emotional distress. Id. ¶ 78.

### iii.   Argument

**A.   THE DEFAMATION AND ABUSE OF PROCESS CLAIMS ARE NOT SUBJECT TO DISMISSAL UNDER THE ANTI-SLAPP STATUTE**

The Kirchicks have moved to dismiss Counts II (Defamation) and V (Abuse of Process) of the Complaint under the Massachusetts anti-SLAPP statute, G.L. c. 231, § 59H. However, under the applicable framework for analyzing special motions to dismiss under this statute, the claims at issue unquestionably must survive.

The anti-SLAPP statute provides that "[i]n any case in which a party asserts that the civil claims, counterclaims, or cross claims against said party are based on said party's exercise of its right of petition…, said party may bring a special motion to dismiss." G.L. c. 231, § 59H. Because special motions to dismiss are not "to be used ... as a cudgel to forestall and chill the legitimate claims -- also petitioning activity -- of those who may truly be aggrieved by the sometimes collateral damage wrought by another's valid petitioning activity," the Supreme Judicial Court has established a burden-shifting framework to "distinguish between meritless claims targeting legitimate petitioning activity and meritorious claims with no such goal." Blanchard v. Steward Carney Hospital, 477 Mass. 141 (2017) ("Blanchard I").

The framework, announced in Duracraft Corp. v. Holmes Prods. Corp., 427 Mass. 156, 167-168 (1998) and augmented in Blanchard I, has two stages. The first stage places the burden on special movants to establish "through pleadings and affidavits that the claims against it 'are based on the petitioning activities alone and have no substantial basis other than or in addition to the petitioning activities.'" Id. at 148. If the movant does not establish "that the challenged counts are based solely on their petitioning activity…the special motion must be denied." Wenger v. Aceto, 451 Mass. 1, 5 (2008).

Only if the Kirchicks were able to meet this burden would the analysis proceed to the

second. In the second stage, the burden shifts to Plaintiffs to show by a preponderance of the evidence that either (i) Defendants' petitioning activity had no basis in law or fact, i.e., that it was a sham, or (ii) Plaintiffs' claims were not brought primarily to chill Defendants' exercise of their petitioning rights, i.e., that the Plaintiffs' claims are colorable and were not retaliatory.  Id. at 159; Blanchard v. Steward Carney Hospital, Inc., 382 Mass. 200, 204 (2019) ("Blanchard II") (internal quotation marks omitted). If Plaintiffs establish either of these paths, the motion must be denied. See Blanchard II, 382 Mass. at 206.

The Kirchicks' motion fails at both stages of this analysis as explained below.

**1.  Plaintiffs' Claims are Not Solely "Based on" Petitioning Activity.**

In the first stage of analysis, Defendants have the burden to establish that Plaintiffs' defamation and abuse of process claims are based *solely* on petitioning activity. Blanchard I at 148. To meet this burden, the Defendants first must establish that the activities upon which the defamation and abuse of process claims are based qualify as "petitioning activity" as defined by G.L. c. 231, § 59H. Haverhill Stem LLC v. Jennings, 99 Mass. App. Ct. 626 (2021).

a.   The Defamation Claim is not Based "Solely" on Petitioning Activity

The defamation claim is premised on the fact that Rudnick, on behalf of all three Defendants, 1) made defamatory statements about Plaintiffs to local business owners to convince them to sign no-trespass orders banning Mr. Kaiser from their businesses, and 2) subsequently transmitted these orders, and others for his own businesses, to the police and had them serve the orders on Mr. Kaiser. As explained more fully in the Plaintiffs' Opposition to Rudnick's Motion to Dismiss, most of the private actions through which Rudnick procured the no-trespass orders from others in no way qualify under the statutory definition of "petitioning." The transmission of the other businesses' orders to the police is also not protected as the statute only covers petitioning on one's own behalf. Moreover, as explained below with respect to the abuse of process claim, Rudnick's statements and actions were simply steps in the Defendants' larger plan to harass the Plaintiffs and thus are not the sole basis for the claim, which is aimed primarily at redressing their conduct as a whole.

10

b.   The Abuse of Process Claim is Not Based "Solely" On Petitioning Activity

The Kirchicks have not met their burden of establishing that the abuse of process claim is based solely on petitioning activity. "Given that the invocation of process necessarily constitutes petitioning activity…, an actionable abuse of process claim will always be, at least in part, based on a special movant's petitioning activities…." 477 Harrison Ave., LLC v. JACE Bos., LLC, 477 Mass. 162, 169 (2017). Nonetheless, an abuse of process claim is not always solely based on petitioning. Id. Where a "plaintiff alleges that the defendants engaged in any conduct germane to its abuse of process claim, apart from their invocations of process," this additional conduct "can provide a 'substantial basis' for its claim" thus defeating a special motion to dismiss. Id.

As in many other cases where abuse of process claims survived anti-SLAPP motions, any process here was invoked, alongside a slew of other, non-petitioning activities, in order to achieve illicit ends unrelated to the process itself. See id. at 169 citing Keystone Freight Corp. v. Bartlett Consol., Inc., 77 Mass.App.Ct. 304, 314 (2010). As laid out clearly and meticulously in the Complaint, the actions that Defendants argue qualify as petitioning activities – Rudnick's transmission of the no-trespass orders to the police, the Kirchicks' applications for permits with the ZBA, and the filing of the Superior Court Action – were merely discrete steps in Defendants' broader, protracted campaign of harassment designed to force Plaintiffs to capitulate to the Defendants' demands to cut down the trees and grant them a view easement. This "threatening and disruptive conduct 'before, after and separate' from the petitioning activity at issue" which was "all for the purpose of trying to extract financial and business concessions from [plaintiff]" must be considered when determining the basis of the abuse of process claim. See AM Project Norwood, LLC v. Endicott S. Dev. Corp., 2018 WL 4937835, at *2 (Mass. Super. Aug. 21, 2018); Haverhill Stem LLC v. Jennings, 99 Mass. App. Ct. 626 (2021) (affirming order denying special motion to dismiss even where some activity was petitioning).

The Kirchicks, who have the burden of proof on this issue, have made no meaningful effort to establish why their alleged "petitioning" activities should be viewed independently of the context of their other wrongful behavior. Id. ("mere denial" of plaintiff's allegations

11

concerning other non-petitioning conduct underlying abuse of process claim "is not sufficient" to meet first stage burden). Indeed, the Kirchicks' Motion contains no affidavit proof at all.

      **2.  Plaintiffs Can Meet Their Second Stage Burden through Either of the Two Paths**

The Court's analysis need not proceed beyond the first stage because of Defendants' failure to meet their threshold burden. However, even if Defendants were able to show that the two claims were based "solely" on their petitioning activity, Plaintiffs can easily defeat the motion at the second stage. The second stage offers two alternative and distinct paths to defeat an anti-SLAPP challenge. First, a non-movant can show that "there is no credible factual or legal basis" for the movant's petitioning activities, and the activities were "in essence, a sham." Blanchard II, 483 Mass. at 204. Alternatively, non-movants can meet their burden by demonstrating that the defamation and abuse of process clams are colorable and that they were not brought for a retaliatory purpose. Blanchard II, 483 Mass. at 204. Plaintiffs easily meet their burden through the first path, and they can certainly succeed through the second path, which Defendants have failed to assert in any way, much less provide argument and authorities.

      a.  The Defendants' Activities Constituted Sham Petitioning

With respect to the first path, the alleged petitioning activities underlying the defamation and abuse of process claims constituted sham petitioning. The burden on Plaintiffs to make this showing is not intended to function as "an insurmountable barrier to relief," and therefore a preponderance of the evidence standard applies. Baker v. Parsons, 434 Mass. 543, 553–54 (2001). Because none of the Kirchicks' activities had credible legal or factual bases and they caused actual harm to the Plaintiffs, Plaintiffs easily meet this burden.

      i.  The ZBA Applications Had No Credible Legal or Factual Bases

The Kirchicks' ZBA applications for special permits had no credible bases. The Kirchicks filed an application purporting to convert their garage to an in-law apartment and, in connection with that, to create a new driveway and parking area just feet away from Plaintiffs' front door which would have required the destruction of mature vegetation Plaintiffs planted with the Kirchicks consent years earlier. See Furnish Aff. ¶¶ 14-17. The application was

baseless. The Kirchicks' lot is approximately 6,000 square feet, and the general rule is that lots must be at least 30,000 square feet to add a guest unit. Id. ¶¶ 15, 18. The ZBA may grant a waiver of the lot size requirement, but the exemption requires that the guest unit be "occupied" by a member of the immediate family which "occupies" the principal dwelling. Id. ¶ 18. This has a reasonable connotation of more than the Kirchicks' occasional seasonal use. Id., Compl. ¶ 12.

Further proof of the baselessness of the application lies in how the Kirchicks pursued it. They repeatedly caused the hearing to be continued immediately before, or even at, the scheduled hearing, knowing Plaintiffs already incurred the cost to travel to Massachusetts in order to attend. See Furnish Aff. ¶¶ 22-27. Finally, in February 2019, the ZBA indicated it intended to deny the application because it did not meet the exemptions requirements; the Kirchicks then withdrew the application. Id. ¶ 26. The next month, they refiled a nearly identical application.[9] Id. ¶ 27. The ZBA denied the Kirchicks' second application. Id. ¶ 28.

The intent of these filings was not to pursue any legitimate purpose but instead to coerce the Plaintiffs into removing their trees by diminishing the value of Plaintiffs' home, requiring them to make repeated trips from Texas to Massachusetts, and causing them to incur substantial legal and other costs to oppose the applications.

Demonstrating the lack of credible factual or legal basis for these applications by a preponderance of the evidence is not difficult here because the Kirchicks' Motion contains *no* evidence to rebut this point. Their motion only summarily states that they filed applications for permits with the ZBA and merely offer the legal conclusion that these actions "were factually and legally supported." Kirchick Mem. at 13. This is not evidence.

ii.   The Superior Court Case Had No Credible Legal or Factual Bases

The Kirchicks' Superior Court action against the Plaintiffs was equally frivolous. That complaint included four counts: trespass, abuse of process, and two requests for declaratory

_____

[9] While the Kirchicks have recast this application, stating that the first related to an in-law apartment and the second to a "right of way" (see Kirchick Mem. at 13), the "second" application sought the same exemption for an in-law apartment. See Furnish Aff. Exs. E and F.

relief concerning the private way running between the four lots in the subdivision.

The Kirchicks' claim that Plaintiffs abused process by petitioning for an HPO was entirely baseless. Tellingly, this claim was brought not just against Mr. Kaiser, who obtained the HPOs, but also against Mr. Furnish, who did not invoke *any* process against the Defendants. See Furnish Aff. ¶¶ 5-9. He was not a plaintiff on the HPO application and he did not appear or testify at the *ex parte* hearing. Id. Moreover, Mr. Kaiser clearly had a good faith basis to obtain the orders. First, the police advised Plaintiffs to seek the orders, and second, the court issued them. Importantly, the Kirchicks then *voluntarily agreed to extend the HPO's restrictions*, which is inconsistent with the claim that the orders were somehow improper. See Compl. ¶¶ 63-65.

The claims related to rights in the private way, including the trespass claim, were also baseless for a number of reasons, including that the Kirchicks do not own the land on which they claim Plaintiffs trespassed, and that even if they did, Plaintiffs installed plantings in that area only after receiving the Kirchicks' written consent, vitiating any trespass. See 14D Mass. Prac., Summary of Basic Law § 16:25 Privileged entries: consent or license (5th ed.).

Moreover, as with the ZBA applications, the Kirchicks tellingly failed to take steps to diligently prosecute the Superior Court action, reinforcing the fact that is was brought for an improper purpose and baseless. In fact, the Court dismissed the Kirchicks' claims because of their refusal to respond to basic discovery. See Furnish Aff. ¶¶ 9-12.

Once again, the Kirchicks' attempt to rebut this point consists entirely of conclusory statements and no evidence. They simply list the claims they asserted in the Superior Court action and state that they alleged that the Plaintiffs caused trees and other items to be placed on their property. They then summarily state that these actions "were factually and legally supported." Kirchick Mem. at 13. Having produced no evidence, they cannot rebut Plaintiffs' factual showing.

### iii.    The Defendants' Activities Caused Plaintiffs Actual Injury

The Defendants' pursuit of legally and factually baseless claims caused Plaintiffs actual injury. Hundreds of thousands of dollars have been spent dealing with Defendants' conduct

including attorneys' fees and travel expenses to attend various hearings and depositions. See Furnish Aff. ¶ 38. Moreover, Plaintiffs suffered embarrassment from the issuance of the no-trespass orders and the means through which they were served. Id. ¶¶ 29-37. Their reputations were harmed by their public exclusion from many of the businesses in the small community of Chatham. The emotional toll has been substantial as well. Id. ¶ 39. All of these items constitute actual harm under the anti-SLAPP analysis. See 477 Harrison Ave., LLC v. JACE Bos., LLC, 477 Mass. 162, 174–75 (2017); Millennium Equity Holdings, LLC, 456 Mass. 627, 645 (2010).

b.   Plaintiffs' Claims Are Colorable and Are Not Retaliatory in Nature

"The court's task with regard to the second path is to assess the 'totality of the circumstances pertinent to the nonmoving party's asserted primary purpose in bringing its claim,' and to determine whether the nonmoving party's claim constitutes a SLAPP suit." Blanchard I, 477 Mass. at 159. This is done by showing (a) that its suit was "colorable"; and (b) that the suit was not "'brought primarily to chill' the special movant's . . . legitimate exercise of its right to petition." Blanchard II, 483 Mass. at 204.

Although the Kirchicks argue that their motion "must" succeed if the Court finds in their favor on the first path of the second stage of the analysis, that assertion is a completely incorrect statement of current law post-Blanchard. See Steinmetz v. Coyle & Caron, Inc., 862 F.3d 128, 133 (1st Cir. 2017). The Kirchicks fail to provide any argument, authorities, or evidence relevant to this second path and have thus waived any right to rely on this path. Accordingly, there is no question that the Plaintiffs' unrebutted showing on this second path of the framework meets the preponderance of the evidence standard required to deny the Kirchicks' motion.

i.   Plaintiffs' Claims are Colorable

Because "SLAPPs are by definition meritless suits…[a] necessary but not sufficient factor in this analysis will be whether the nonmoving party's claim at issue is 'colorable or ... worthy of being presented to and considered by the court." Blanchard II, 483 Mass. at 207–08 (internal quotations and citations omitted). To find a claim is colorable means the claim is "one that is worthy of presentation to a court, not one which is sure of success" one that "'offers some

reasonable possibility' of a decision in the party's favor." Id. at 208. Whether a claim is "colorable" is "a 'lighter, less technical burden' of presenting a claim where threshold considerations are implicated, at a stage in the litigation when discovery typically has not yet occurred. Id. Both claims easily meet this threshold showing.

### a.   The Defamation Claim is Colorable

Plaintiffs' defamation claim is colorable. To state a claim for defamation, a plaintiff must show: "(a) The defendant made a statement, concerning the plaintiff, to a third party…[;] (b) The statement could damage the plaintiff's reputation in the community…[;] (c) The defendant was at fault in making the statement…[; and] (d) The statement either caused the plaintiff economic loss (traditionally referred to as "special damages" or "special harm"), or is actionable without proof of economic loss." Ravnikar v. Bogojavlensky, 438 Mass. 627, 629–30 (2003).

The Complaint alleges that Rudnick made untrue, reputation-harming statements about Plaintiffs to convince business owners to sign no-trespass orders against Mr. Kaiser. It further alleges that the Defendants "published to a substantial portion of the Chatham community that Mr. Kaiser, and by innuendo Mr. Furnish, had engaged in bad behavior sufficient to warrant the issuance of no trespass orders," and that the defamation caused them harm. Compl. ¶ 85. As explained more fully in Plaintiffs' Opposition to Rudnick's Motion to Dismiss, these allegations state a valid claim for defamation despite Defendants' misplaced arguments to the contrary.

In their brief, the Kirchicks argue that the Complaint fails to state a defamation claim as to them because neither of them was alleged to have made defamatory statements directly about Plaintiffs. However, the Complaint alleges – and the exhibits to it clearly establish – that Rudnick engaged in his activities as part of a conspiracy with the Kirchicks and on behalf of all three Defendants. They are liable for defamation as members of this conspiracy. See Patriot Grp., LLC v. Edmands, 96 Mass. App. Ct. 478, 489 (2019).

### b.   The Abuse of Process Claim is Colorable and Properly Pled

Plaintiffs' abuse of process claim is also more than "colorable," and is more than sufficiently pled to give the Kirchicks fair notice of the claims, and thus well enough to deny the

16

Kirchicks' motion to dismiss under Rule 12(b)(6). Plaintiffs address both arguments here. To state a claim for abuse of process, a plaintiff must show that "(1) process was used, (2) for an ulterior or illegitimate purpose, (3) resulting in damage." 477 Harrison Ave., LLC v. JACE Bos., LLC, 483 Mass. 514, 526–27 (2019). "[A]t its essence, abuse of process is a 'form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money'" Id.

A court's goal in reviewing a Rule 12(b)(6) motion is to determine whether the factual allegations in the plaintiff's complaint sets forth "a plausible claim upon which relief may be granted." Woods v. Wells Fargo Bank, N.A., 733 F.3d 349, 353 (1st Cir.2013). The court must take all the pleaded factual allegations in the complaint as true. Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). In short, plaintiffs are not required to submit evidence to defeat a Rule 12(b)(6) motion but need only sufficiently allege in their complaint a plausible claim. See Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71–72 (1st Cir. 2014) (reversing grant of R. 12(b)(6) dismissal).

Defendants used process and it was undertaken for an ulterior purpose: to force Plaintiffs to either cut down the trees and grant them a view easement or leave town. The Complaint presents evidence of the ulterior motives behind Defendants' abuse of process in vivid detail by laying out the entire campaign of harassment in which Defendants engaged in order to force Plaintiffs to capitulate to their demands and by attaching emails in which Defendants explain their motives in their own words. See, e.g., Compl. ¶¶ 48, 50-51, 54, 66.

Moreover, after the Superior Court case was filed, Defendants tried to use that case as leverage to demand that Plaintiffs cut down their trees and grant the Kirchicks a view easement in exchange for dismissal of their suit. See Furnish Aff. ¶ 7, Ex. A. The fact that the Kirchicks demanded relief relating to the trees that they could not legally seek in their complaint more than supports a finding of improper purpose. See R.C. v. R.K., 98 Mass. App. Ct. 1106 (2020) (email sent immediately after filing specious complaint in which R.K. seemingly sought to leverage that complaint to obtain an advantageous resolution of unrelated, weak adverse possession action supported finding of abuse of process).

Plaintiffs were damaged by Defendants' abuse of process in a variety of ways. The no-trespass orders damaged their reputations as well as prevented them from patronizing many businesses in town and fully enjoying the use of their property. See Furnish Aff. ¶¶ 29-37. They also incurred expenses in defending against the Defendants' litigation and threats and travelling to attend the hearings and depositions only to have the Defendants repeatedly reschedule them at the last minute. Id. ¶¶ 38-40.

        ii.   The Claims were not Brought to Chill the Kirchicks' Petitioning

Finally, Plaintiffs can easily show that these claims were not brought primarily to chill the Kirchicks' exercise of petitioning rights, i.e., that [they were] not retaliatory." 477 Harrison Ave, 483 Mass. at 522–23. To do so, Plaintiffs "must establish that [their] primary goal was 'not to interfere with and burden [the defendants'] ... petition rights, but to seek damages for the personal harm to [them] from [the defendants'] alleged ... [legally transgressive] acts." Costigan v. Kanieff, 99 Mass. App. Ct. 1130, n.4 (2021). "Because at this stage the motion judge is to assess in a holistic fashion whether the claim at issue is a 'SLAPP' suit, the nonmoving party's showing in this regard is as to the entirety of its claim." Blanchard I, 477 Mass. at 160 n.25.

The circumstances here make overwhelmingly clear that Plaintiffs' primary purpose in bringing the defamation and abuse of process claims was to enjoin Defendants' threats, harassment, coercion and intimidation and to remedy the harms that Plaintiffs have suffered and continue to suffer, not to chill any legitimate petitioning activity. These claims are part of a much larger complaint asserting a number of other claims. In assessing whether the abuse of process and defamation claims were brought primarily to chill petitioning activity, the court must consider "the significance of [these] particular claim[s] in the context of the litigation as a whole." Blanchard II, 483 Mass. at 207 n.11. The allegations of the Complaint illustrate that this action as a whole is unquestionably aimed at seeking redress for the Defendants' overall pattern of threats, harassment, and intimidation. See Costigan, 99 Mass. App. Ct. at *2, n.4 (non-movant's detailed allegations of "a contentious history between the parties...support[ed] the judge's conclusion that the counterclaim "[wa]s designed to press defendant's claim ... [and was]

not designed to chill plaintiff[s'] petitioning activity."). The defamation and abuse of process claims present just two theories of liability aimed at that conduct. Indeed, the behavior underlying these claims is part of a larger course of conduct that constitutes a legitimate Massachusetts Civil Rights Act ("MCRA") claim, which Defendants have not challenged. See Ayasli v. Armstrong, 56 Mass. App. Ct. 740, 748–49 (2002).

Another factor clearly demonstrating that the instant case was not intended to chill petitioning activity is that the Defendants already exercised their petitioning rights *years* ago. See Blanchard II, 483 Mass. at 207 n.9, n.12. The ZBA applications were respectively withdrawn and denied in early 2019. See Furnish Aff. ¶¶ 26, 28. The Kirchicks' claims against Plaintiffs in the Superior Court case were dismissed in August 2019.[10] Id. ¶ 11. "It is not reasonable to conclude that [Plaintiffs were] motivated to chill the [Kirchicks'] petitioning rights when those rights had already been exercised and resolved." See Kagan Development KDC Corp. v. Brusenkova, 2018 WL 3209212, at *2 (Mass.Super. Jan. 19, 2018).

Also worth noting is that this case in no way presents a typical or "classic" SLAPP suit in that it was not "directed at individual citizens of modest means for speaking publicly against development projects." Blanchard II, 483 Mass. at 206. "[T]he presence or absence of the classic indicia may be considered" in determining whether a suit is intended to chill petitioning rights. Id. The indicia are certainly not present here.

**B.  THE DEFAMATION AND INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIMS ARE NOT SUBJECT TO DISMISSAL UNDER RULE 12(b)(6)**

The Kirchicks have also moved to dismiss the defamation and intentional infliction of emotional distress claims under Rule 12(b)(6). Taking the allegations as true, as is required under a Rule 12(b)(6) review, both claims have been adequately pled and should survive. The defamation claim survives for the reasons explained above in Section A(2)(b)(i)(a). The

---

[10] The Kirchicks imply that their state court claims against Plaintiffs are still alive by stating in their Memorandum that the claims "will be the subject of a jury trial" (Kirchick Mem. at 13), while repeatedly acknowledging to the state court their position that the claims they brought against the Plaintiffs have been dismissed and are no longer live claims. See Furnish Aff. ¶ 12.

Complaint also adequately states a claim for intentional infliction of emotional distress. To plead such a claim, a Plaintiff must allege that (1) the defendant intended to inflict emotional distress (2) through "extreme and outrageous" conduct, (3) causing plaintiff severe emotional distress. Agis v. Howard Johnson Co., 371 Mass. 140, 144–45 (1976).

The Kirchicks challenge only the second of these requirements, that the conduct alleged in the Complaint does not rise to the level of "extreme and outrageous." The Complaint details a years-long, multi-pronged harassment and intimidation campaign expressly designed to make Plaintiffs' lives "miserable" and force them to capitulate to Defendants' demands or drive them out of town. This is sufficient to show extreme and outrageousness. The SJC has made it abundantly clear that claims for intentional infliction of emotional distress may be founded on a pattern of misconduct. See Boyle v. Wenk, 378 Mass. 592 (1979) ("Repeated harassment . . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress"); Vittands v. Sudduth, 49 Mass.App.Ct. 401, (2000) (denying summary judgment to defendant whose actions preventing neighbor's building spanned years).

Even if any single action in their scheme alone may be insufficient to rise to that level, there can be no serious debate that these actions, taken together, were beyond the bounds of acceptable conduct in a civilized society. N. Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting LLC, 491 F.Supp.2d 111, 132 (D. Mass. 2007). In short, the Complaint hardly presents a "situation[] where only bad manners and mere hurt feelings are involved." Agis v. Howard Johnson Co., 371 Mass. 140, 144–45 (1976).

While the Defendants may disagree, the allegations in Plaintiffs' complaint, when taken as true, the allegations are sufficient to deny the Kirchicks' motion. The question of what constitutes "outrageous" behavior is ultimately one of fact that should be reserved for the factfinder at a later stage in the proceedings. Id. at 45.

## Conclusion

For the foregoing reasons, Defendants' respective motions to dismiss should be denied.

Respectfully submitted,

GRANT KAISER and JOHN FURNISH,

By their attorneys,

/s/ Alycia M. Kennedy
Howard M. Cooper (BBO #543842)
Max D. Stern (BBO #478560)
Alycia M. Kennedy (BBO # 688801)
Todd & Weld LLP
1 Federal Street, 27th Floor
Boston, MA 02110
hcooper@toddweld.com
mdstern@toddweld.com
akennedy@toddweld.com
Dated: July 30, 2021                              (617) 724-2626


## CERTIFICATE OF SERVICE


I, Alycia M. Kennedy, hereby certify that this document has been filed through the ECF system, will be sent electronically to the registered participants as identified on the notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.


/s/ Alycia M. Kennedy
Alycia M. Kennedy