# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **GRANT KAISER and JOHN FURNISH,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **21-10590-FDS** |
| ) | |
| **WILLIAM DEAN KIRCHICK, and** ) | |
| **CAROL RUDNICK KIRCHICK,** ) | |
| **individually and as trustees of the** ) | |
| **41 SEAVIEW TERRACE REAL** ) | |
| **ESTATE TRUST, and RONALD** ) | |
| **STEVEN RUDNICK,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM AND ORDER ON
## <u>DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT</u>

**SAYLOR, C.J.**

This case involves a protracted dispute between neighbors who own vacation properties on Cape Cod. The dispute began with a disagreement about two pear trees on the border between the properties. It has since escalated grossly out of proportion to the actual underlying issues, spawning multiple legal proceedings in multiple courts.

Plaintiffs Grant Kaiser and John Furnish own a property in Chatham, Massachusetts. Defendants William Dean Kirchick and Carol Rudnick Kirchick own the property next door; the two properties share a private way. Carol's brother, Ronald Rudnick, is a Chatham resident employed in the real-estate business.

In the summer of 2017, the Kirchicks told plaintiffs that two pear trees they had planted in 2008 were obstructing their view. In August 2017, Rudnick began instructing his employees

to park a commercial truck in the private way leading to plaintiffs' home in order to pressure them to do something about the trees. Plaintiffs did not take any action in response.

After commissioning a survey of their property, in March 2018 the Kirchicks concluded that plaintiffs' mailbox and a fence were on their property. They proposed that plaintiffs remove the pear trees and grant them a view easement, in exchange for leaving the mailbox and fence in place. That proposal was not accepted.

The dispute quickly escalated. In March 2018, Rudnick submitted an offer to purchase a nearby home that (plaintiffs contend) was accepted by the sellers. Plaintiffs then submitted an offer for $500 more, which was also accepted, and eventually led to the sale of the property to them.

Meanwhile, the pear trees remained in place. At different points, defendants allegedly informed plaintiffs that they would pave over the private way, dig up their bushes, and remove their mailbox and fencing if plaintiffs did not agree to their demands.

In June 2018, plaintiffs obtained Harassment Prevention Orders ("HPOs") against all three defendants. The following month, Rudnick obtained No Trespassing Orders ("NTOs") barring Kaiser from nine commercial properties in Chatham that Rudnick either owned or controlled. Rudnick told one of the business owners that plaintiffs had an active HPO against him, and informed another that the plaintiffs were "going after" him and planned to sue over a staged slip-and-fall accident.

In the summer of 2018, defendants filed two separate lawsuits against plaintiffs in Barnstable Superior Court. In July 2018, the Kirchicks filed a complaint alleging trespass and abuse of process arising out of the HPOs, and sought a declaratory judgment related to the property boundary. That lawsuit was eventually settled. In August 2018, Rudnick filed a

complaint alleging tortious interference in the sale of the neighboring property. That lawsuit was voluntarily dismissed.

In July 2018, The Kirchicks applied for a permit to convert two bedrooms into an in-law apartment in their house. Plaintiffs opposed the permit, and the Zoning Board of Appeals denied the request.

Eventually, plaintiffs filed this lawsuit in federal court on April 9, 2021. They allege that defendants had "carefully crafted a multipronged plan of 'attack'" and had "subjected [them] to an unconscionable pattern of harassment, intimidation, defamation, threats, and coercion designed to interfere with Plaintiffs' use and enjoyment of their home and the broader Chatham community." (Amend. Compl. ¶ 1). The complaint alleges violations of the Massachusetts Civil Rights Act, defamation, intentional infliction of emotional distress, civil conspiracy, and abuse of process. Plaintiffs seek damages, fees, and costs, and a permanent injunction against future threats, intimidation, harassment, and coercion. Jurisdiction is based on diversity of citizenship.

Defendants have collectively moved for summary judgment on all counts. They have also moved to strike the statement of additional facts submitted with plaintiffs' opposition to summary judgment. For the reasons set forth below, the motion to strike will be denied, and the motions for summary judgment will be granted in part and denied in part.

## I.   Background

### A.   Rule 56.1 Motion to Strike

Before reciting the facts, the court will first address defendants' joint motion to strike. In addition to their opposition memoranda, plaintiffs filed responses to the Kirchicks' and Rudnick's statements of fact, specifying whether each fact was disputed and citing to plaintiffs' exhibits. Plaintiffs also separately filed a "statement of additional material facts in support of their oppositions to defendants' motions for summary judgment," which included 155 additional

factual claims with citations to the record.

Defendants allege that plaintiffs' statement of additional facts ("SOAF") "is not concise, contains unsupported accusations, opinions, arguments[,] and legal conclusions, and creates undue burdens on the Defendants and this court" and should be struck in its entirety.  (Defs. Mem. at 1).

Local Rule 56.1 requires a party opposing summary judgment to "include a concise statement of the material facts of record as to which it is contended that there exists a genuine issue to be tried, with page references to affidavits, depositions and other documentation."  L.R. 56.1.  "Unless the court orders otherwise, the moving party may file a reply within 14 days after the response is served."  *Id.*

Defendants appear to contend that plaintiffs should not have been permitted to file their own statement of facts without filing a cross-motion for summary judgment.  However, Local Rule 56.1 does not clearly prescribe what form a nonmoving party's opposition must take.  It does require that the nonmoving party identify which of the moving party's facts are in dispute, with citations to the record to explain the basis for that dispute.  *See, e.g.*, *Wired Informatics, LLC v. OmniMD, Inc.*, 2022 WL 623870, at *1 (D. Mass. Mar. 3, 2022) ("[Non-movant] failed to comply with Local Rule 56.1 when it filed an opposition to [movant's] motion for partial summary judgment, but did not file a counterstatement of material facts . . . or otherwise assist the Court in determining which facts are genuinely in dispute.").  Plaintiffs have individually responded to each of defendants' stated facts to identify which are in dispute with citations to the record, and defendants have not objected to the sufficiency of those responses.

Defendants also allege that plaintiffs' 155 paragraphs of additional facts are immaterial, conclusory, inadmissible, and/or not concise.  While the SOAF could certainly be more succinct,

the length is not unreasonable given that defendants have moved for summary judgment on all five counts in a case dealing with conduct extending back to at least 2017.  "[D]etermining whether the disputed issues are material" is the court's basic task at summary judgment, and therefore the purported immateriality of the additional facts is not a ground for excluding them from consideration entirely.  *Brown v. Armstrong*, 957 F. Supp. 1293, 1297 (D. Mass. 1997).  To the extent that the additional facts are conclusory or go beyond the task of identifying "material facts of record as to which it is contended that there exists a genuine issue to be tried," the court will disregard plaintiffs' submissions.  L.R. 56.1.  And finally, to the extent defendants wish to object that "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence" under Fed. R. Civ. P. 56(c)(2), defendants have failed to specify the inadmissible statements and the grounds for objection.

Accordingly, the motion to strike will be denied.

### B.     Factual Background

Except where otherwise noted, the following facts are undisputed.

#### 1.     The Parties

Grant Kaiser and John Furnish are a same-sex married couple with a principal residence in Houston, Texas.  (Amend. Compl. ¶ 1, 6-7).  In 2008, Kaiser and Furnish purchased a property at 39 Seaview Terrace in Chatham, Massachusetts, which they use as a seasonal home. (Pls. Ex. 67; Kaiser Dep. at 65).  At the relevant times, Kaiser was a lawyer practicing in Texas.

William Dean Kirchick and his wife, Carol Rudnick Kirchick, have a seasonal home at 41 Seaview Terrace in Chatham, which is adjacent to plaintiffs' property.  (C. Kirchick Dep. at 22-24; W. Kirchick Dep. at 13).  At the relevant times, William Kirchick was a lawyer practicing in Massachusetts, and Caroline Kirchick was an inactive member of the bar.  (Answer ¶ 3).

Ronald Steven Rudnick is Carol Kirchick's brother.  He is a real estate broker and contractor who owns and/or controls Lighthouse Realty Property Management.  (Amend. Compl. ¶ 13-14, 30).

### 2. The Pear Trees

In 2008, Kaiser and Furnish planted pear trees along the fence line with the Kirchicks' property.  (Kaiser Dep. at 285; Kirchick Ex. E).  In 2011, Kaiser and Furnish discussed moving one of the pear trees and removing some greenery; William Kirchick responded, "your plans are fine with us."  (Pls. Ex. 70; Furnish Dep. at 226).

In the summer of 2017, the Kirchicks became concerned that two remaining mature pear trees were obstructing their view.  (C. Kirchick Dep. at 95; W. Kirchick Dep. at 89).  Carol Kirchick discussed the possibility of obtaining a view easement over the plaintiffs' property with Rudnick by e-mail.  (Kirchick Ex. A.2; *see also* C. Kirchick Dep. at 160).  On August 22, 2017, she met with Kaiser and Furnish, who decided to consult with one or more landscaping companies to determine whether the trees could be transplanted successfully somewhere else on their property.  (Rudnick Exs. 8-9; Pls. Exs. 95-96).

Beginning in August 2017—and before plaintiffs informed defendants of their plans concerning the trees—Rudnick instructed at least one Lighthouse Realty employee to park a commercial truck in the entrance of the private way leading to plaintiffs' property.  (Rudnick Dep. at 208; Barr Dep. at 34-35).  William Kirchick told Kaiser that the truck was present to do "some touch ups in the house."  (Pls. Exs. 100).

In fact, there was no work being done on the Kirchicks' property that required the use of the truck.  (Barr. Dep. at 34-35).  William Kirchick testified that that "white lie . . . was meant to get their attention in order to have a meeting."  (W. Kirchick Dep. at 147; *see also* C. Kirchick

Dep. at 206-207; Rudnick Dep. at 208).  The Kirchicks exchanged e-mails with one another in which they clearly indicated that the truck was parked for the purpose of pressuring plaintiffs to remove the trees.[1]

Nonetheless, plaintiffs did not appear to appreciate the true purpose of the parked truck. On September 12, 2017, Kaiser sent an e-mail to the Kirchicks asking whether "you [will] be finished with the work on your house" by the time of an anticipated meeting on September 23. (Pls. Ex. 105).  Carol Kirchick responded to her husband, "So he thinks the truck is parked there to do work on our house???"  (*Id*.).  William Kirchick responded to Kaiser, "the work should be done by the 23rd but if not, my brother-in-law thinks it should be done by the end of the month." (Pls. Ex. 106).

Over the next few months, the Kirchicks and Rudnick exchanged e-mails discussing their concerns with the trees and their rights in the private way.[2]  In December 2017, they commissioned a survey of their property boundaries.  (C. Kirchick Dep. at 172).

On March 23, 2018, an attorney for the Kirchicks, Bill Riley, sent a letter to plaintiffs stating that the pear trees had "blocked [the Kirchicks'] view," and that plaintiffs' fence and mailbox were on the Kirchicks' property, or obstructing part of the private way over which they

---

[1] For example, Carol Kirchick wrote to her husband and brother to report that plaintiffs' landscaping company had arrived—"Maybe they are discussing the gd trees?"—and that "they had trouble getting the truck in the driveway . . . [smiley face]."  (Kirchick Ex. A.6).  After Kaiser informed defendants that the truck had been parked for more than three weeks without any work being done on the house, Carol Kirchick e-mailed her brother and husband to suggest that they respond, "Does the truck bother you even though it doesn't affect your enjoyment of your property?  Now you know what those damn trees are doing to us." (Pls. Ex. 100).  William Kirchick suggested that they add "you fargin axels . . . ." to the end of the message. (*Id*.).  Carol Kirchick testified that "fargin axels" was shorthand for "fucking assholes."  (C. Kirchick Dep. at 203-204; W. Kirchick Dep. at 151-152).

[2] For example, on October 18, 2017, Carol Kirchick proposed "writ[ing] to the jerks and say[ing] we are removing the cobblestones on our property and where would they like them?" to which Rudnick responded, "I had [T]om take up the cobble stone and we put them on there [sic] porch."  (Pls. Ex. 108).  Carol Kirchick also e-mailed Rudnick, "I know we can't impair their right of way, but can we restrict them from their improvements? Can you paint [the private way] purple because we like purple?"  (Pls. Ex. 110).

had rights.  (Rudnick Ex. 15).  Riley proposed that the plaintiffs remove the two pear trees and

grant the Kirchicks a view easement in exchange for the Kirchicks giving up "their right to park

or otherwise use the portion of the private way which [plaintiffs] have planted and treat as [their]

private drive," and for leaving the fence and mailbox in place.  (*Id.*).  Riley requested that

plaintiffs respond by April 30, 2018.

### 3.   The White Property

Meanwhile, on March 29, 2018, Rudnick submitted an offer for $875,000 to purchase a

property owned by the estate of Elaine White located nearby at 31 Seaview Terrace.  (Rudnick

Ex. 16).  After some negotiation, the sellers accepted the offer the next day, March 30.  (*Id.*; Pls.

Ex. 53).

Nonetheless, on April 2—three days later—plaintiffs submitted an offer for the White

property in the amount of $875,500.  (Rudnick Ex. 17).  The sellers accepted that offer as well.

(*Id.*).

On April 10, Rudnick filed suit against the White estate in Barnstable County Superior

Court seeking an order compelling the sale of the property to him.  (Compl., *Rudnick v. White*,

No. 1872CV00191) (Pls. Ex. 53).[3]

Rudnick called plaintiffs multiple times on April 12 and 13, 2018, to discuss the sale of

the White property and the dispute over the trees and property boundary.  (Kaiser Dep. at 93-94;

Furnish Dep. at 311-312).  Furnish testified that Rudnick "started threatening us on the phone

about coming in and tearing out the bushes and the mailbox and the cobble and the fence."

(Furnish Dep. at 312).  According to plaintiffs, Rudnick told Kaiser he would "call off the dogs"

---

[3] The parties dispute whether Rudnick's offer was timely accepted and whether a binding contract was
formed.  (Pls. Response to Rudnick SOF ¶ 32).

if they agreed to cut down the two pear trees, but that Rudnick "would make [their] lives miserable" and "run [them] out of town"—like he had done to others on whom he had placed a "black spot"—if plaintiffs did not "capitulate to their demands . . . ."  (Furnish Dep. at 313, 239; Kaiser Aff. at 2; Kaiser Dep. at 95-96).  He also threatened to use his influence with local authorities to "get done whatever he wanted," and to take out no-trespass orders against plaintiffs.  (Kaiser Dep. at 96-97, 99; Furnish Dep. at 65-67, 239-40).

Later that same day, counsel for both Rudnick and the plaintiffs appeared in Barnstable Superior Court for a hearing on a motion for a preliminary injunction concerning the sale of the White property.  (Rudnick Ex. 18).[4]  That evening, Kaiser e-mailed Rudnick to suggest that they work through counsel to try to reach an agreement.  (Pls. Ex. 129).  Rudnick responded, "Every body knows me that I wouldn't have atty negotiate for me I'm done please just answer my text where to put your fence and plants I do not have wait to ask I told you that u had your opening to make this happen I'm going forward on all phases at this point."  (Id.).

On April 12 and 13, Rudnick and Kaiser texted one another about both the property dispute and the dispute concerning the White Property.  (Rudnick Ex. 20).  Among other things, Kaiser texted that "keeping the second tree preserves Bill and Carols and our privacy."  (Id.).  Rudnick responded, "She wants 2 trees down."  (Id.).  On April 13, Rudnick texted that Kaiser should tell him "where u want your mailbox and fence and I will have professional landscape Co to dig up your bushes and burlap them in a ball."  (Id.).  Later in the text exchange he gave Kaiser 30 days to consider what his position was as to the fence and mailbox; he wrote, "I'm not going to give up my rights on [the White property] also I will not take down your fence or mail

---

[4] Plaintiffs did not intervene in the action until September 26, 2018.  (Mot. to Intervene, *Rudnick v. White*, No. 1872CV00191).

box till you are satisfied.  I think 30 days should give you plenty of time to get your surveyor.

I'm giving way to [sic] much up over 2 trees."  (*Id.*).

During the same period, the Kirchicks and Rudnick exchanged emails about their efforts

to have the trees removed.  For example, on April 13, Carol Kirchick e-mailed Rudnick:  "Buy

the White's house and we will rename the private drive, Rudchick Way."  (Pls. Ex. 126).

William responded, "No, 'F__k you Grant and John Way.'"  (*Id.*).  The same day, Carol e-mailed

Rudnick:

> . . . When spring and summer roll around, we cannot see anything out of the first floor or
> second floor windows on the back side of our house.  And sitting on our deck is
> claustrophobic.
>
> . . . We want the two trees removed.  If they insist on one tree, let's resume status quo
> and proceed with removing the fence and attending to the driveway.
>
> Bill and I appreciate everything you are trying to do for us, but at some point enough is
> enough. You should buy the [Whites'] house and we will deal with the trees, the
> driveway, the fence and the truck.
>
> They live in a neighborhood.  An existing neighborhood, I would add.  They want to live
> on an isolated island.  They should move.  It would be good for them, and for us.

(Pls. Ex. 78).

Plaintiffs eventually "donated" $25,000 to the White family, which "resulted in the

family having enough money to execute a settlement [with Rudnick] and to sell the home."

(Kaiser Dep. at 266).

### 4.        The Harassment-Prevention Orders

On May 24, 2018, Lighthouse Realty personnel arrived and cut back the mature privet

hedge lining the Kirchicks' side of the private way and facing plaintiffs' property.  (Rudnick

SOF ¶¶ 62, 93; Kaiser Aff. at 3).  Beginning that same day, various Lighthouse Realty trucks

were left parked in the private way during non-business hours through at least June 8.  (Kaiser

Aff. at 3).  According to Rudnick, the trucks were parked on property owned by the Kirchicks, and "never impeded the [p]laintiffs from accessing their home via the private way."  (Rudnick SOF ¶ 73-74).

On June 1, attorney Riley informed one of plaintiffs' attorneys that the Kirchicks owned and had the right to use half of the private way, and that on June 8 they would remove vegetation planted by plaintiffs that allegedly obstructed their access.  (Pls. Ex. 140).  On June 6, plaintiffs met with Chatham Chief of Police Mark Pawlina and Sergeant William Glover "requesting assistance on how to protect their property while [giving] the Attorneys a chance to work out a fair disposition with their neighbors" concerning the pear trees and property boundary dispute. (Rudnick Ex. 35).  Sergeant Glover informed plaintiffs of the option of filing a civil injunction to prevent removal of the plantings and of the right to seek a criminal harassment order pursuant to Mass. Gen. Laws ch. 258E.  (*Id.*).[5]

Attorney Riley followed up on June 7, to communicate that "nothing w[ould] be done by my clients or their agents" the following day and that "nothing w[ould] ever be done without at least one week's notice."  (Rudnick Ex. 32).   He also wrote that he had an offer "that w[ould] resolve the White property issue as well as the issues with the Kirchicks."  (*Id.*).  Riley later texted plaintiffs' attorney, Peter Brooks, "We are good send it when you can," presumably referring to a draft of the settlement agreement.  (Rudnick Ex. 33).  Brooks texted back, "The

---

[5] Under Mass. Gen. Laws ch. 258E, a "person suffering from harassment" may seek an order that the defendant refrain from abusing, harassing, or contacting the plaintiff, remain away from the plaintiff's home or workplace, or pay monetary compensation.  Mass. Gen. Laws ch. 258E § 3.  "Harassment" is defined as "3 or more acts of willful and malicious conduct aimed at a specific person committed with the intent to cause fear, intimidation, abuse or damage to property and that does in fact cause fear, intimidation, abuse or damage to property."  *Id.* § 1.  A court may also enter a temporary order without prior notice to the defendant if the plaintiff "demonstrates a substantial likelihood of immediate danger of harassment."  *Id.* § 5.  "The court shall give the defendant an opportunity to be heard on the question of continuing the temporary order and of granting other relief as requested by the plaintiff not later than 10 court business days after such orders are entered."  *Id.*  A violation of a harassment prevention order is a criminal offense punishable by a fine of not more than $5,000 and/or imprisonment for not more than 2 1/2 years.  *Id.* §§ 4, 9.

truck parked in the way has been received as a message of further pressure and coercion and an act of bad faith" and that his clients would "not respond under those circumstances." (*Id.*). Riley responded, "The truck will be moved shortly." (*Id.*). He then texted, "Call me immediately the offer is withdrawn" and "He says he will be there in the morning removing vegetation from the right of way." (*Id.*).

On June 8, Kaiser obtained *ex-parte* harassment prevention orders under Mass. Gen. Laws ch. 258E against Rudnick and the Kirchicks in the Orleans District Court. (Pls. Exs. 146-48). The HPOs, among other things, ordered them to "remain away" from Kaiser's residence. (*Id.*). On July 2, 2018, plaintiffs entered into an agreement with the Kirchicks vacating the orders against them and providing that neither party would remove any vegetation for a 60-day period, during which plaintiffs could bring an action to seek an adjudication of the rights of the parties in the right-of-way. (Pls. Ex. 154). The matter was not, however, resolved as to Rudnick.

The Barnstable District Court held a hearing as to Rudnick on July 17. (Rudnick Ex. 12). At the hearing, Judge Robert A. Welsh declined to extend the harassment order as to Rudnick, concluding that "Mr. Rudnick went a little too far" but that his conduct did not amount to "harassment." (*Id.* at 45-46).

As Rudnick left the courtroom, he told plaintiffs, "Now the fun begins." (Furnish Dep. at 141).[6]

### 5.       The No-Trespass Orders

Meanwhile, on June 19, 2018, Rudnick went to the Chatham Police Department, seeking information about obtaining no-trespass orders ("NTO"s) for all of his commercial properties.

---

[6] On July 26, 2018, after the Kirchicks filed a complaint against plaintiffs in Barnstable County Superior Court, Rudnick e-mailed Carol Kirchick, "The fun begins remember I said that to him[.]" (Amend. Compl. Ex. 18).

(Pls. Ex. 186).[7]  He advised the officer that his request was "solely based on retaliation for a HPO that was issued against him." (*Id.*).

On July 31, Rudnick delivered NTOs to the Chatham Police station to be served on Kaiser.  One of the NTOs barred Kaiser from the Del Mar Restaurant, which is owned by John Zartarian.  (Pls. Ex. 190 at 1; Pls. Ex. 2; Zartarian Dep. at 11).  Rudnick (through Lighthouse Realty) was Zartarian's landlord.  (Zartarian Dep. at 25).  Zartarian testified that Rudnick "came to [him] and said that he had a dispute with these two people, and that they had issued a restraining order on him and that he didn't want to be excluded from a property that he owned . . . ."  (Zartarian Dep. at 20).  While Zartarian "vaguely" remembered that the disagreement "was a residential property dispute involving a property line," he testified that Rudnick did not explain the basis for the restraining order.  (*Id.* at 21-23).  At the time Zartarian signed the application for an NTO, the HPO was no longer in effect, but Rudnick did not inform Zartarian of that fact.  (*Id.* at 26-27).  Rudnick "offered [the plaintiffs'] names," but Zartarian did not know either Kaiser or Furnish.  (*Id.* at 19, 21).

Rudnick also procured an application for an NTO from Kevin McLain, director of the Orpheum Theater in Chatham.  (McLain Dep. at 7).  Lighthouse Realty does not own the theater; however, Lighthouse owns the surrounding condominium complex, and the theater pays condominium fees to Lighthouse.  (*Id.* at 11-12).  McClain testified that Rudnick asked him to sign an NTO application "to protect all of the businesses in the condominium complex from

---

[7] Mass. Gen. L. ch. 266, § 120 provides that "[w]hoever, without right enters or remains in or upon the [property] of another . . . after having been forbidden so to do by the person who has lawful control of said premises, whether directly or by notice posted thereon . . . shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than thirty days or both such fine and imprisonment."  While "[p]roof that a court has given notice of [] a court order to the alleged offender shall be prima facie evidence that the notice requirement of this section has been met," it appears that notice may also be effected through service of a no-trespassing order by the police department.

being sued . . . by someone who was trying to go after him." (*Id.* at 13).

According to McLain, Rudnick told him that "this person was going to come onto the condominium complex and pretend . . . to fall, and then sue all of us." (*Id.* at 13). While he did not remember the "specifics" of why Rudnick thought plaintiffs were "going after" him, "other than they were in a disagreement or a lawsuit against each other," McLain stated that he was "sure [Rudnick] probably mentioned the names" of the plaintiffs. (*Id.* at 16, 65). McLain has never met Kaiser or Furnish, and testified that he knew "nothing about [Kaiser] . . . on any level." (*Id.* at 16-17, 66).

The Chatham Police Department served the NTO for Del Mar Restaurant on Kaiser on August 1, 2018. (Pls. Ex. 190 at 2). The police declined to serve the NTO for the Orpheum Theater after Kaiser informed the police that Rudnick did not own the theater. (Pls. Ex. 190 at 3).

In total, Rudnick obtained NTOs against Kaiser from at least nine establishments. (Pls. Ex. 2).

### 6.    **Other Legal Proceedings**

On July 26, 2018, the Kirchicks filed a special permit request with the Chatham Zoning Board of Appeals, proposing to convert two bedrooms at their residence to an in-law apartment. (Pls. Ex. 15). Kaiser and Furnish opposed the application, and the ZBA denied the request. (Kaiser Resp. to Kirchick SOF ¶ 70; C. Kirchick Dep. at 309).

Also on July 26, the Kirchicks filed a lawsuit in Barnstable County Superior Court against Kaiser and Furnish, alleging trespass, abuse of process arising out of the issuance of the HPOs, and declaratory relief regarding ownership of the private way. (Compl., *Kirchick et al. v. Kaiser et al.*, No. 1872CV00397) (Pls. Ex. 241). Eventually, on August 2, 2019, the court

entered a default judgment in favor of Kaiser and Furnish because of the Kirchicks' failure to comply with their discovery obligations.  (Pls. Ex. 181).[8]

On August 7, 2018, Rudnick filed suit against Kaiser and Furnish in Barnstable County Superior Court, alleging that plaintiffs had improperly interfered in his offer to purchase the White property.  (Compl., *Rudnick v. Kaiser, et al.*, No. 1872CV00426).  Rudnick filed a voluntary stipulation of dismissal of all claims on January 21, 2020.  (Pls. Exs. 232-33).[9]

Plaintiffs contend that they spent $577,836.72 in legal fees and expenses related to all legal proceedings.[10]

Furnish testified that he "experienced a lot of fear and a lot of anxiety" because of defendants' conduct, including "fear about being in [his] own home" and "for [his] safety," difficulty sleeping, nightmares, "the shakes," and "problems eating and keeping [down] food." (Furnish Dep. at 152-153).  Furnish attests that he "sought medical treatment for stress, anxiety, sleep disturbances, difficulty concentrating and feeling overwhelmed due to the stress of their harassment."  (Furnish Aff. ¶ 39).  Kaiser similarly reported that he believed that an episode of shingles was "aggravated and came on because of the stress [he] was under," that he "suffered [] psychological and emotional issues," and that he experienced "sleepless nights, difficulty sleeping, being severely depressed where [he] had no motivation to do the things [he] normally

---

[8] According to the docket, the parties settled the matter on August 21, 2021, and the court entered final judgment as to Kaiser and Furnish on January 21, 2022.

[9] Rudnick's involvement with the plaintiffs' property also continued throughout this time.  At various points from 2018 through 2020, Rudnick allegedly trespassed onto plaintiffs' land, and approached and yelled at staff working on plaintiffs' yard.  (Kaiser Resp. to Rudnick Interrog. at 13; Pls. Exs. 195, 197, 229).

[10] That amount includes $310,277.71 in legal fees and expenses related to *Kirchick et al. v. Kaiser et al.*, No. 1872CV00397; $244,507.82 in legal fees and expenses related to *Rudnick v. Estate of Elaine White*, No. 1872CV00191 and *Rudnick v. Kaiser et al.*, No. 1872CV00426; $9,481.19 in legal fees and expenses related to the harassment prevention orders; $9,700 in legal fees and expenses related to the ZBA petitions; and $3,870.00 in legal fees and expenses related to the Kirchicks' request for zoning enforcement.  (Pls. Ex. 18 ("Expert Report, Hon. Robert C. Rufo")).

did, . . . difficulty controlling [his] anger, and . . . interfere[nce] with [his] social life."  (Kaiser Dep. at 335-336).

C.      **Procedural Background**

Plaintiffs filed suit in this court on April 9, 2021, alleging the following claims:  (1) violations of the Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, §§ 11H, 11I, and 11J, and violations of Articles I, X, and XII of the Massachusetts Declaration of Rights; (2) defamation; (3) intentional infliction of emotional distress ("IIED"); (4) civil conspiracy; and (5) abuse of process.  Plaintiffs seek damages and a permanent injunction against further intimidation.  (Amend. Compl. ¶ 5).

In June 2021, Rudnick and the Kirchicks filed motions to dismiss.  On December 16, 2021, Magistrate Judge Marianne B. Bowler denied defendants' special motions to dismiss Counts 2 and 5 pursuant to Massachusetts' anti-SLAPP statute, Mass. Gen. Laws ch. 231, § 59H; denied Rudnick's partial motion to dismiss Count 5 pursuant to Fed. R. Civ. P. Rule 12(c); and denied the Kirchicks' partial motion to dismiss Count 3 pursuant to Fed. R. Civ. P. 12(b)(6).  Judge Bowler granted the defendants' partial motions to dismiss Count 2 for failure to identify a defamatory statement, but granted plaintiffs additional time to amend the complaint to cure deficiencies in the defamation claim.  Plaintiffs filed an amended complaint on April 7, 2022.

Rudnick and the Kirchicks have now moved for summary judgment on all counts.

II.     **Standard of Review**

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is

"one that must be decided at trial because the evidence, viewed in the light most flattering to the

nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."

*Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In

evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of

the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a

properly supported motion for summary judgment is made, the adverse party must set forth

specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon

mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.*

at 256-57.

### III.   Analysis

#### A.   Statute of Limitations

The Kirchick defendants have moved for summary judgment on the MCRA, IIED, and

civil conspiracy claims on the ground that those claims were brought outside of the relevant

limitation periods.  They contend that the limitations period for all three claims began to run in

August 2017, when the Lighthouse Realty truck was first parked in the private way.  According

to defendants, plaintiffs knew or should have known at that point that the truck indicated the

beginning of the alleged harassment campaign.  Plaintiffs respond that the claims did not accrue

prior to April 2018, when defendants allegedly first overtly threatened them.

#### 1.   Limitations Period

Actions under the MCRA are governed by a three-year statute of limitations.  Mass. Gen.

Laws ch. 260, § 5B.[11]  Actions in tort—including IIED and civil conspiracy—are also governed by a three-year statute of limitations.  Mass. Gen. Laws. ch. 260, § 2A.[12]  *See also Pagliuca v. City of Bos.*, 35 Mass. App. Ct. 820, 822-23 (1994).  In response to the COVID-19 pandemic, the Massachusetts Supreme Judicial Court tolled the running of all civil limitations periods from March 17, 2020, to June 30, 2020.  *See* Supreme Judicial Court, Third Updated Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 (Coronavirus) Pandemic, No. OE-144 (June 24, 2020); *see also Shaw's Supermarkets, Inc. v. Melendez*, 488 Mass. 338, 339 (2021) (interpreting order to apply to all claims with statutes of limitations running for some period between specified dates).  That order effectively added an additional 106 days to the limitations period for any claim that had not expired by March 17, 2020.

Plaintiffs filed suit on April 9, 2021.  The MCRA, IIED, and conspiracy claims are therefore barred if they accrued before December 24, 2017 (3 years and 106 days before the filing of the complaint).

## 2.   **Accrual**

"In general, a tort cause of action accrues either when the plaintiff is injured as a result of the defendant's unlawful act or omission, or, if the wrong is 'inherently unknowable,' when the plaintiff knows or should know that she has been injured.'"  *Pagliuca*, 35 Mass. App. Ct. at 824 (first citing *Joseph A. Fortin Constr., Inc. v. Massachusetts Hous. Fin. Agency*, 392 Mass. 440, 442 (1984); and then quoting *Riley v. Presnell*, 409 Mass. 239, 245-248 (1991)).  A plaintiff need not have "notice of every fact which must eventually be proved in support of the claim,"

---

[11] "Actions arising on account of violations of any law intended for the protection of civil rights . . . shall be commenced only within three years next after the cause of action accrues."  Mass. Gen. Laws ch. 260, § 5B.

[12] "Except as otherwise provided, actions of tort . . . shall be commenced only within three years next after the cause of action accrues."  Mass. Gen. Laws ch. 260, § 2A.

but must have "knowledge that an injury has occurred." *Id.* (quoting *White v. Peabody Constr. Co.*, 386 Mass. 121, 130 (1982)).  *See also Shepardson v. American Fam. Life Assurance Co. of Columbus*, 525 F. Supp. 3d 210, 215-16 (D. Mass. 2021) (IIED); *Sexual Minorities Uganda v. Lively*, 960 F. Supp. 2d 304, 332-33 (D. Mass. 2013) (common-law civil conspiracy).

For MCRA claims, "the limitations period has been held to commence on the date of the allegedly wrongful acts, unless the wrong is 'inherently unknowable.'" *Pagliuca*, 35 Mass. App. Ct. at 822-23 (quoting *Flynn v. Associated Press*, 401 Mass. 776, 781-782 (1988)).  "A plaintiff need not know the extent or severity of the harm suffered.  To start the limitations period a plaintiff need only have knowledge of all the facts necessary to make out his civil rights claim." *Arsenault v. Otto*, 2022 WL 4329395, at *2 (D. Mass. Sept. 19, 2022).

Defendants rely on the fact that when Kaiser spoke to the Chatham Police in June 2018, he stated that "all this mess started" in August 2017.  (Kaiser Dep. 250; *see also id.* at 103).  Furnish also testified that "things started to change a little bit"—referring to plaintiffs' relationship with the Kirchicks—starting in August 2017.  (Furnish Dep. at 251).  However, that retrospective acknowledgement is not sufficient to establish the accrual of the claims.

It is true that the truck first appeared in the private way in August 2017.  But defendants told plaintiffs—falsely—that it was there because work was being performed on their house.  (Pls. Exs. 100, 105-06).  Plaintiffs apparently accepted that explanation at face value.  Indeed, on September 12, 2017, Carol Kirchick expressed surprise to her husband that Kaiser believed their story.  (Pls. Ex. 105) ("So he thinks the truck is parked there to do work on our house???").  Defendants cannot be granted summary judgment on the ground that plaintiffs should have realized that they were not telling the truth.  And according to plaintiffs, it was not until they received "threatening" messages from Rudnick on April 12 and 13, 2018—stating that "he was

going to park that truck there as long as it took" for plaintiffs to give into his demands or leave

town—that they understood the "true purpose of the trucks." (Kaiser Dep. at 81-82; Pls. Opp'n

to Kirchick Mot. at 8).

At the very least, "any disputed issues relative to the statute of limitations ought to be

decided by the jury," including "factual disputes concerning when a plaintiff knew or should

have known of his cause of action." *Riley*, 409 Mass. at 247-48. Because a jury could

reasonably conclude that plaintiffs' claims did not accrue until April 2018, summary judgment

on the basis of statute of limitations will be denied as to Counts 1, 3, and 4.

### B. Count 1: Massachusetts Civil Rights Act

Count 1 asserts a claim under the Massachusetts Civil Rights Act, Mass. Gen. Laws ch.

12, §§ 11I, 11H and 11J.

To establish a claim under the MCRA, plaintiff "must prove that (1) his exercise or

enjoyment of rights secured by the Constitution or laws of either the United States or of the

Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the

interference or attempted interference was by "threats, intimidation or coercion."" *Bally v.

Northeastern Univ.*, 403 Mass. 713, 717 (1989) (quoting Mass. Gen. Laws. ch. 12, § H). A

threat is "the intentional exertion of pressure to make another fearful or apprehensive of injury or

harm." *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994).

Intimidation "involves putting in fear for the purpose of compelling or deterring conduct." *Id.*

And coercion is "the application to another of such force, either physical or moral, as to constrain

him to do against his will something he would not otherwise have done." *Id.* (quoting *Deas v.

Dempsey*, 403 Mass. 468, 471 (1988)).[13] Massachusetts courts apply an objective "reasonable

---

[13] The elements of "threats" and "intimidation" under the MCRA usually require actual or threatened
physical force. *Kennie v. Natural Res. Dep't of Dennis*, 451 Mass. 754, 763 (2008); *Ayasli v. Armstrong*, 56 Mass.

person" standard to determine whether conduct constitutes threats, intimidation, or coercion. *Haufler v. Zotos*, 446 Mass. 489, 505 (2006).

### 1.     Protected Rights

Plaintiffs contend that their MCRA claim is based on two protected rights:  the "right to acquire, possess, improve, and use and enjoy their home and property," and the "right to enjoy public establishments without fear of discrimination, threats, intimidation or coercion."  (Amend. Compl. ¶ 95).[14]

 "The right to enjoy life and liberty and to acquire, possess and protect property are secured to every one under the Constitution of Massachusetts and under the Constitution of the United States.  These guaranties include the right to own land and to use and improve it according to the owner's conceptions of pleasure, comfort or profit, and of the exercise of liberty and the pursuit of happiness."  *Brett v. Building Com'r of Brookline*, 250 Mass. 73, 77 (1924). Infringement of the right to use and enjoy one's private property may form the basis of an MCRA claim.  *Haufler*, 446 Mass. at 504.  Accordingly, to the extent the MCRA claim is based on plaintiff's right to enjoy their own home and property, that element is clearly satisfied.

To the extent that it is based on the right to enjoy public establishments, the issue is a much more difficult question.  Plaintiffs have pointed to no case in which the right to enjoy public establishments formed the basis of an MCRA claim.  Mass. Gen. Laws ch. 272, § 98 makes it a crime to "make[] any distinction, discrimination or restriction on account of race, color, religious creed, national origin, sex, gender identity, [or] sexual orientation . . . relative to

---

App. Ct. 740, 751-52 (2002).  Coercion, however, is a broader category that may rely on physical, moral, or economic coercion.  *See Kennie*, 451 Mass. at 763; *Haufler v. Zotos*, 446 Mass. 489, 505 (2006); *Buster v. George W. Moore, Inc.*, 438 Mass. 635, 646-48 (2003).

[14] Plaintiffs cite to Articles I, X, and XII of the Massachusetts Declaration of Rights, the Fourteenth Amendment to the United States Constitution, and Mass. Gen. Laws ch. 272, §§ 92, 98 as the bases for these rights.

the admission of any person to, or his treatment in any place of public accommodation."[15]  The

statute further recognizes and declares "the right to the full and equal accommodations,

advantages, facilities and privileges of any place of public accommodation" to be "a civil right."

*Id.*

Plaintiffs attempt to frame the right as "the civil right to be permitted to enter a place of

public accommodation absent 'good cause' to issue an NTO."  (Pls. Opp'n to Rudnick Mot. at 12

(citing *Smith v. Suburban Restaurants, Inc.*, 374 Mass. 528, 530 (1978) ("A place of public

accommodation . . . has an obligation to treat each member of the public equally, except for good

cause.")).  However, under Massachusetts law, a business owner is not required to permit a

business licensee to remain on the premises.  *Alexis v. McDonald's Restaurants of

Massachusetts, Inc.*, 67 F.3d 341, 350 (1st Cir. 1995) (collecting cases).  Therefore, the right at

issue is more accurately defined as the right not to be excluded from a public establishment on

discriminatory grounds.  Here, the alleged discriminatory ground is exclusion on the basis of

sexual orientation.[16]

To begin, plaintiffs did not exhaust their remedies before the Massachusetts Commission

on Discrimination before filing their MCRA claim.  That is not, however, necessarily fatal.

*Peters v. Boston Properties, Inc.*, 2021 WL 3493907, at *5 (Mass. Super. June 15, 2021) ("[A]

---

[15] Public accommodation is defined as "any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public."  Mass. Gen. Laws ch. 272, § 92A.

[16] For that reason, plaintiffs' extended discussion of whether the NTOs were obtained without "good cause" is irrelevant.  (See Pls. Opp'n to Kirchick Mot. at 12-14).  It is true that Rudnick did not have the right to issue NTOs for properties that he did not own or control.  *See* Mass. Gen. Laws ch. 266 § 120 (making it a crime to enter or remain in a building "having been forbidden so to do by the person who has lawful control of said premises").  Furthermore, Rudnick appears to have falsely represented to McLean that plaintiffs intended to file a slip-and-fall action and to Zartarian that he would be barred from entering the Del Mar when Kaiser was present by a non-existent HPO.  While Rudnick's actions are perhaps relevant to determining the existence of discriminatory intent, they do not themselves violate plaintiffs' protected rights, because plaintiffs are not guaranteed the right to enter any Chatham business.

plaintiff alleging discrimination in a place of public accommodation is not required to exhaust the administrative remedies available under [Mass. Gen. Laws ch.] 151B, § 5.").  Furthermore, the complaint does not allege that the purpose of the NTOs was unlawful discrimination on the basis of sexual orientation.[17]

A more fundamental problem is that the plaintiffs allege that the purpose of the NTOs was to pressure them into removing their trees and granting an easement—that is, to pressure them into giving up their right to enjoy their private property; it was not to discriminate against them on the basis of their sexual orientation.  And what little evidence there is on that subject is not sufficient to sustain a claim of discriminatory intent—more precisely, that the purpose of the NTOs was to exclude plaintiffs from public establishments in order to discriminate against them as a gay couple.[18]  Under the circumstances, there is insufficient evidence to sustain a MCRA claim based on the right not to be excluded from a public establishment on discriminatory grounds.

## 2.      Threats, Intimidation, or Coercion

The amended complaint further alleges that defendants have interfered with plaintiffs' property rights by "a nearly [three-year] pattern of threats, intimidation, harassment, coercion[,]

___

[17] The amended complaint does assert that "[d]efendants' issuance of these no trespass orders to Mr. Kaiser, which practically impacts his husband, is especially intimidating to a same-sex couple that faces discrimination."  (Am. Compl. ¶ 88).  But that allegation essentially states that the NTOs had a greater *impact* on plaintiffs because they were a same-sex couple—not that Rudnick intended to obtain NTOs against them *because* they were a same-sex couple.  It is also noteworthy that no NTOs were issued against Furnish.

[18] That evidence is largely confined to Carol Kirchick's October 18, 2017 e-mail to her brother, which states, "Can you paint [the private way] purple because we like purple?"  (Pls. Ex. 110).  Plaintiffs interpret that statement as having a homophobic connotation; Kaiser testified that "they might as well put up a sign and say, 'This is where the fags live' in town . . . ."  (Kaiser Dep. at 155).  Even assuming she intended that connotation, she did not make the statement in connection with obtaining any NTOs against plaintiffs.  Moreover, Rudnick did not obtain the NTOs until July 2018, nine months later.

Plaintiffs also point out that all three defendants repeatedly referred to them privately as "fargin axels," "dirtbags," "jerk(s)," "bastards," "pigs," and "asshole(s)."  (C. Kirchick Dep. at 204; Pls. Exs. 20-27, 37-38, 87, 94).  Those comments, while certainly unpleasant, are not homophobic slurs.

and defamation."  (Amend. Compl. ¶ 96).

Rudnick first contends that summary judgment is appropriate because the MCRA "was never intended to provide a tort cause of action to litigate neighborly disputes."  (Rudnick Mem. at 2).  However, Massachusetts cases have allowed MCRA claims to proceed based on conduct analogous to that alleged here.  *See, e.g.*, *Ayasli v. Armstrong*, 56 Mass. App. Ct. 740, 753 (2002) (jury question as to whether homeowners' statements that they would "do everything they could" to stop plaintiffs' construction of home, efforts to impose restrictive permit conditions, invasion of plaintiffs' property, and erection of gates across plaintiffs' right of way, constituted threats or intimidation that infringed plaintiffs' right to enjoy their property); *Bell v. Mazza*, 394 Mass. 176, 182 (1985) (complaint stated a claim for interference with property rights by threats, intimidation, or coercion where neighbors "threatened to do anything at any cost" to prevent plaintiffs' construction of a tennis court, including forming an association in opposition, threatening to sue a contractor, physically blocking access to property, and attempting to induce electric company to cut off service to plaintiffs); *Haufler v. Zotos*, 446 Mass. 489, 506 (2006) (recording of deed and complaints to public officials did not constitute coercion interfering with property rights, but physical and verbal confrontations with landowner and workers on his property did).

Rudnick further asserts that summary judgment is appropriate because he did not actually interfere with any secured rights through threats, intimidation, or coercion.  However, a reasonable jury could interpret the evidence—including, among other things, the parking of the truck in the private way; Rudnick's statements by text, e-mail, and telephone in April 2018; and his procurement of the NTOs—as efforts to coerce plaintiffs into cutting down the pear trees and

24

granting an easement over their property.[19]  The fact that plaintiffs did not in fact cut down the

trees, grant the easement, or leave town does not defeat their claim.  Even an attempted

interference with protected rights can support an MCRA claim.  *Bally*, 403 Mass. at 717.

Therefore, plaintiffs have presented sufficient evidence to create a material issue of fact as to

whether Rudnick's conduct interfered with their right to use and enjoy their property by threats,

intimidation, or coercion.

Accordingly, summary judgment will be denied as to plaintiffs' MCRA claim based on

their right to enjoy their home and property, but granted as to the claim based on their right not to

be excluded from a public establishment.[20]

### C.     Count 2:  Defamation

Count 2 asserts a claim for defamation.  Under Massachusetts law, "[d]efamation is the

publication, either orally or in writing, of a statement concerning the plaintiff which is false and

causes damage to the plaintiff."  *Yohe v. Nugent*, 321 F.3d 35, 39-40 (1st Cir. 2003) (citing

*McAvoy v. Shufrin*, 401 Mass. 593, 597 (1988)).  To establish a defamation claim, a plaintiff

must show (1) that the defendant made a statement concerning the plaintiff to a third party; (2)

that the statement could damage the plaintiff's reputation in the community; (3) that the

defendant was at fault in making the statement; and (4) that the statement either caused the

plaintiff economic loss or is actionable without proof of economic loss.  *Shay v. Walters*, 702

F.3d 76, 81 (1st Cir. 2012) (citing *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 629-30 (2003)).

---

[19] Specifically, plaintiffs allege that Rudnick threatened to "make [their] lives miserable," "run [them] out of town," and place a "black spot" upon them if they did not capitulate to defendants' demands.  (Furnish Dep. at 313, 239; Kaiser Aff. at 2; Kaiser Dep. at 95-96).

[20] The Kirchicks have moved for summary judgment on the MCRA claim solely based on the statute of limitations.  As stated above, summary judgment will be denied on that basis.

      1.        **Statements Concerning Plaintiffs**

Defendants have moved for summary judgment on the ground that plaintiffs have not identified any potentially defamatory statements "with sufficient precision." (Rudnick Mem. at 15; Kirchick Mem. at 11).

The amended complaint simply alleges that Rudnick "published to a substantial portion of the Chatham community that Mr. Kaiser and Mr. Furnish[] had engaged in bad behavior sufficient to warrant the issuance of no trespass orders." (Compl. ¶ 99). However, in their memorandum, plaintiffs have identified three specific statements that they allege to be defamatory: (1) Rudnick's statement to McLain that plaintiffs intended to stage a slip-and-fall accident and sue the condominium complex for money damages; (2) Rudnick's statement to McLain that Kaiser was "going after" him; and (3) Rudnick's statement to Zartarian that there was an active HPO in place against him. (Pls. Opp'n to Kirchick Mot. at 11). As to the latter statement, plaintiffs further contend that Rudnick implied that the HPO was obtained under false pretenses.[21]

There is evidence that Rudnick spoke to McLain about signing an NTO application in order to protect businesses in his condominium complex from being sued by someone who was "trying to go after" him and who intended to stage a slip-and-fall accident. (McLain Dep. at 13). McLain stated that he was "sure [Rudnick] probably mentioned the names" of the plaintiffs. (*Id.* at 16). There is also evidence that Rudnick falsely told Zartarian that plaintiffs had an active HPO against him. The Court will accordingly analyze whether those three statements are actionable.

---

[21] Plaintiffs do not identify any allegedly defamatory statements made by the Kirchicks, instead arguing that they are liable for Rudnick's statements on an agency theory.

2.      **Statement of Opinion**

Defendants contend that Rudnick's statements, even if defamatory, are constitutionally

protected opinions.

"[T]o be actionable, the statement must be one of fact rather than opinion." *Scholz v.*

*Delp*, 473 Mass. 242, 249 (2015). *See also King v. Globe Newspaper Co.*, 400 Mass. 705, 708

(1987), *cert. denied*, 485 U.S. 940 (1988) ("Statements of pure opinion are constitutionally

protected."). Summary judgment is appropriate with respect to challenged statements that cannot

reasonably be construed as statements of fact. *King*, 400 Mass. at 709.

The alleged statement that plaintiffs had an active HPO against Rudnick is a statement of

fact, not opinion—that is, it can be proved to be true or false.

The alleged statement that plaintiffs intended to stage a slip-and-fall accident is

speculation about plaintiffs' future actions, rather than a factual claim about past conduct. *King*,

400 Mass. at 713 (newspaper editorial that speculated about the billboard industry's improper

actions, objectives, and lobbying practices was protected opinion).

Similarly, the alleged statement that plaintiffs were "going after" Rudnick lacks "an

easily ascertainable and objectively verifiable meaning" that could render it falsifiable.

*Levinsky's, Inc. v. Wal-Mart Stores, Inc.*, 127 F.3d 122, 129 (1st Cir. 1997) (statement that

competitor store was "trashy" was "loose language that cannot be objectively verified," and

therefore protected opinion). *See also Gray v. St. Martin's Press, Inc.*, 221 F.3d 243, 249 (1st

Cir. 2000) (statement that plaintiff had "faked" closeness to president and senior administration

officials was "a vague and subjective characterization of what happened," and therefore

protected opinion). Therefore, Rudnick's statements to McLain cannot reasonably be construed

as verifiable statements of fact.

Plaintiffs respond that even if Rudnick's statements were opinions, they are nonetheless

actionable because they imply "imply the existence of undisclosed defamatory facts on which the opinion purports to be based . . . .'" *Scholz*, 473 Mass. at 252-253 (quoting *King*, 400 Mass. at 713). Specifically, plaintiffs contend that "[a]ll of the statements implied . . . that Mr. Kaiser perjured himself and is willing to commit criminal acts to extort and defraud businesses and procure court orders by fraud." (Pls. Opp'n to Kirchick Mot. at 13). But there is no evidence of a statement from which a reasonable listener could infer that Kaiser lied to the court or perjured himself in obtaining the HPO. Furthermore, a statement that Kaiser is "willing to commit criminal acts" is no less a statement of opinion than the statement that he "intended" to do the same. Plaintiffs have not identified any undisclosed facts that render the opinions actionable.

Accordingly, while summary judgment may be granted as to Rudnick's statements to McLain on the ground that they are non-actionable opinions, summary judgment will not be granted as to Rudnick's statements to Zartarian on that basis. For the sake of completeness, the Court will analyze the parties' remaining arguments concerning both sets of statements.

### 3. Defamation by Implication

Plaintiffs contend that Rudnick falsely told Zartarian that there was an active HPO against him, and implied that it was obtained under false pretenses. The context in which the statement was made could conceivably imply that plaintiffs' behavior was disreputable enough to warrant a no-trespass order. *Cf. Smith v. Suburban Restaurants, Inc.*, 374 Mass. 528, 530 (1978) (letter sent by defendant's attorney to plaintiff and police department informing plaintiff that she was no longer welcome in defendant's restaurant due to her past conduct was capable of discrediting plaintiff in minds of community).

Plaintiffs have not, however, produced any evidence to show that Rudnick stated to Zartarian—even by implication—that Kaiser had obtained the HPO under false pretenses. Rudnick testified at his deposition that plaintiffs falsely informed the judge presiding over the

HPO hearing that he physically threatened them.  (Rudnick Dep. 282-83).  But plaintiffs point to no evidence that Rudnick made a similar statement to Zartarian or McLean.  While Zartarian "vaguely" remembered that Rudnick informed him that there "was a residential property dispute involving a property line" and that two individuals had obtained a restraining order against Rudnick, he testified that Rudnick did not explain the basis for that order.  (Zartarian Dep. at 21-23).

To the extent, therefore, that the defamation claim is based on the implication that Rudnick obtained the HPO by false pretenses, it necessarily fails.

### 4.    Reputation in the Community

Defendants further contend that any statements Rudnick made were not defamatory because neither Zartarian nor McLain developed a negative opinion of plaintiffs.  In support of that argument, defendants point out that neither Zartarian nor McLain had ever met Kaiser or Furnish, and that both testified that they did not form a negative opinion of plaintiffs because of Rudnick's statements.

That argument misapprehends the relevant standard for determining whether a statement is defamatory.  Plaintiffs need not identify any specific individual who has formed a negative opinion because of Rudnick's statements.  They need only show that the statement "*could* damage the plaintiff's reputation in the community." *Shay*, 702 F.3d at 81 (emphasis added). *See also Yohe*, 321 F.3d at 40.  That is an objective standard, judged from the perspective of a "reasonable" reader or listener. *Amrak Prods., Inc.*, 410 F.3d at 72.  A reasonable listener could conclude that hearing that plaintiffs were "going after" Rudnick and intended to stage a slip-and-fall accident would discredit them "in the minds of any considerable and respectable segment in the community." *Draghetti v. Chmielewski*, 416 Mass. 808, 811 (1994).

Therefore, summary judgment will not be granted for failure to show that any individual

listener developed a negative opinion of plaintiffs.

>       5.      **Damages**

Rudnick further contends that plaintiffs have failed to prove economic damages or to show that any of the statements were defamatory *per se*.

Generally, a plaintiff must show special harm to prevail on a claim of defamation. *Lynch v. Lyons*, 303 Mass. 116, 119 (1939). "Special harm . . . is the loss of something having economic or pecuniary value." RESTATEMENT (SECOND) OF TORTS § 575 cmt. b (1977). However, "[f]our types of statements are actionable without proof of economic loss:  statements that constitute libel; statements that charge the plaintiff with a crime; statements that allege that the plaintiff has certain diseases; and statements that may prejudice the plaintiff's profession or business." *Ravnikar*, 438 Mass. at 630 (citations omitted); RESTATEMENT (SECOND) OF TORTS § 570.  Defamatory statements that fall within one of those exceptions permit the recovery of noneconomic losses, including emotional and reputational damages.  RESTATEMENT (SECOND) OF TORTS §§ 622 cmt. b, 623 cmt. a.

Plaintiffs do not appear to dispute the absence of economic harm resulting from the allegedly defamatory statements.  Nevertheless, they contend that Rudnick's statements were defamatory *per se* because they damaged Kaiser's reputation as an attorney.  (Pls. Opp'n to Rudnick Mot. at 16).  "One who publishes a slander that ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business, trade or profession . . . is subject to liability without proof of special harm." RESTATEMENT (SECOND) OF TORTS § 573 (1977).  A statement falls within the professional prejudice exception "if it alleges that the plaintiff lacks a necessary characteristic of the profession." *Ravnikar*, 438 Mass. at 631.

Rudnick's statement to McLain that plaintiffs were "going after" him and intended to

stage a slip-and-fall accident could, arguably, impugn Kaiser's professional and ethical reputation, and his ability to be trusted as a lawyer to a reasonable listener. (Pls. Opp'n to Kirchick Mot. at 12). The allegation that Kaiser intended to defraud a court by filing a fabricated claim—and the implication that his purpose was to harass and intimidate Rudnick—imply that Kaiser "lacks a necessary characteristic of the profession." *Ravnikar*, 438 Mass. at 631.[22] As noted, however, Rudnick's statement as to Kaiser's future intentions is an opinion, not an actionable false statement of fact. Furthermore, statements suggesting "that another is *capable* of committing a crime or that he *would* commit it if sufficient opportunity were presented" cannot support a claim for slander *per se*. RESTATEMENT (SECOND) OF TORTS § 571 cmt. c (1977) (emphasis added). *See Kaye v. Prisma Corp.*, 568 N.Y.S.2d 103, 104 (1991) (statement by boss that he wanted to make sure plaintiff did not steal company property not actionable without allegations of special damages, because "mere intent or capability to commit a criminal act is insufficient to constitute slander *per se*"); *Biondi v. Nassimos*, 300 N.J. Super. 148, 156 (App. Div. 1997) (defendant's statement that plaintiff would "order a hit on me" was "not slander *per se* because it merely allege[d] plaintiff's intention to commit a crime sometime in the future rather than a past criminal act").

Plaintiffs also suggest that "[t]he allegation that Mr. Kaiser perjured himself in court falsely accuses him of a crime and is defamatory *per se*." (Pls. Opp'n to Kirchick Mot. at 12). As discussed, there is insufficient evidence to show that Rudnick actually made such a statement, or made it by implication.

---

[22] The alleged slip-and-fall scheme could also be interpreted as accusing plaintiffs of criminal activity—specifically, fraud. Imputation of a crime is defamatory *per se*. *Draghetti*, 416 Mass. at 812 (citing *Stone v. Essex County Newspapers, Inc.*, 367 Mass. 849, 853 (1975)). *Cf. Ellis v. Safety Ins. Co.*, 41 Mass. App. Ct. 630, 635-36 (1996) (false statements that plaintiffs had committed insurance fraud were defamatory *per se* as imputing criminal conduct).

Finally, Rudnick's false statement that there was an active HPO against him does not impugn Kaiser's reputation as a lawyer, as Kaiser had the same right to seek legal protection from perceived harassment as any other citizen.  Nor does it fall within one of the other narrow categories of cases that constitute defamation *per se*.  In the absence of special damages, that claim, too, must fail.

Accordingly, defendants' motions for summary judgment on Count 2 will be granted.

**D.**      **Count 3:  Intentional Infliction of Emotional Distress**

Count 3 asserts a claim for intentional infliction of emotional distress.  To establish a cause of action for intentional infliction of emotional distress, a plaintiff must establish that (1) the defendants intended to inflict emotional distress, or that they knew or should have known that emotional distress was the likely result of their conduct; (2) the conduct of defendants was extreme and outrageous and beyond all possible bounds of decency and was utterly intolerable in a civilized community; (3) that the actions of the defendants were the cause of plaintiff's distress; and (4) the emotional distress sustained by plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.  *Agis v. Howard Johnson Co.*, 371 Mass. 140, 144-45 (1976) (citations omitted).  *See also* RESTATEMENT (SECOND) OF TORTS § 46.

**1.**      **Extreme and Outrageous Conduct**

Both defendants have moved for summary judgment on the ground that plaintiffs have failed to produce sufficient evidence of extreme and outrageous conduct.

"To be considered extreme and outrageous, the defendant's conduct must be beyond all bounds of decency and . . . utterly intolerable in a civilized community.  Liability cannot be founded upon mere insults, threats, or annoyances." *Sena v. Commonwealth*, 417 Mass. 250, 264 (1994) (internal citations and quotations omitted).  "Repeated harassment . . . may compound the outrageousness of incidents which, taken individually, might not be sufficiently

32

extreme to warrant liability for infliction of emotional distress."  *Sindi v. El-Moslimany*, 896 F.3d

1, 21 (1st Cir. 2018) (quoting *Boyle v. Wenk*, 378 Mass. 592, 595 (1979)).  "A jury determining

whether a defendant's conduct is extreme and outrageous in a particular case is 'entitled to draw

reasonable inferences from the totality of the circumstances.'"  *North Shore Pharmacy Servs.,*

*Inc. v. Breslin Assocs. Consulting LLC*, 491 F. Supp. 2d 111, 132 (D. Mass. 2007) (quoting

*Boyle*, 378 Mass. at 595).

Massachusetts courts have found that a triable issue of fact concerning extreme and

outrageous behavior exists where neighbors have interfered with the use or development of

property.  For example, in *Vittands v. Sudduth*, the court found a genuine issue of material fact

existed as to whether a neighbor's actions—including trespassing on plaintiff's property,

harassing potential buyers, threatening to "take" plaintiff's land and prevent construction "at all

costs," and filing arguably meritless litigation to prevent the sale of the land—were extreme and

outrageous.  49 Mass. App. Ct. 401, 410-11 (2000).

Here, there is evidence that Rudnick informed plaintiffs that he would "make [their] lives

so miserable that he would . . . run [them] out of town" (Kaiser Dep. at 96; Furnish Dep. at 156);

threatened to use his influence with local authorities to "get done whatever he wanted" (Kaiser

Dep. at 96-97; 99; Furnish Dep. at 66-67, 239-240); threatened to (and did) take out NTOs "if

[plaintiffs] didn't do what he wanted" (Kaiser Dep. at 96; Furnish 65); trespassed onto plaintiffs'

land (Kaiser Resp. to Rudnick Interrog. at 13); and approached and yelled at staff working on

plaintiffs' yard (Pls. Exs. 195, 197, 229).  There is also evidence that the Kirchicks threatened to

remove plants that plaintiffs had planted along the private way (Pls. Ex. 140) and that they

authorized the parking of the Lighthouse Realty truck (W. Kirchick Dep. at 147; C. Kirchick

Dep. at 206-207).  And while Rudnick seems to have engaged in most of the behavior aimed

directly at plaintiffs, there is ample evidence that the Kirchicks were involved in planning or encouraging his actions.

A jury is "entitled to put as harsh a face on the actions of the [defendant] as the basic facts would reasonably allow." *Richey v. American Auto. Ass'n, Inc.*, 380 Mass. 835, 839 (1980). A trier of fact could conclude that defendants' repeated threats and interference with plaintiffs' property rose beyond mere insults or annoyances to conduct that is beyond all bounds of decency. Because "reasonable people could differ on whether the conduct is 'extreme and outrageous,'" summary judgment is not appropriate on that basis. *Bassett v. Jensen*, 459 F. Supp. 3d 293, 309 (D. Mass. 2020) (quoting *Vittands*, 49 Mass. App. Ct. at 411).

## 2. Emotional Distress

Rudnick also moves for summary judgment on the ground that plaintiffs have not shown severe emotional distress.

Under Massachusetts law, "emotional distress may be deemed severe even if it does not produce any physical manifestations," and plaintiffs may recover even without medical testimony. *Sindi*, 896 F.3d at 22-23 (finding that anguish manifesting in "lost sleep, blinding headaches, heart palpitations, and fears for her safety" that limited plaintiffs' ability to function were severe). *See also* RESTATEMENT (THIRD) OF TORTS: PHYS. & EMOT. HARM § 46 (2012) ("[IIED] is not limited [] to cases in which bodily harm occurs. If the conduct is extreme and outrageous and results in severe emotional harm without any accompanying physical manifestation, liability is appropriate.").

Furnish testified that he "experienced a lot of fear and a lot of anxiety" because of defendants' conduct, including "fear about being in [his] own home" and "for [his] safety," difficulty sleeping, nightmares, "the shakes," and "problems eating and keeping [down] food." (Furnish Dep. at 152-53). Furnish also stated that he "sought medical treatment" for these

symptoms.  (Furnish Aff. ¶ 39).  Kaiser similarly reported stress and depression, "psychological

and emotional issues," "interfere[nce] with [his] social life," and aggravation of a medical

condition.  (Kaiser Dep. at 335-36).

Based on that evidence, a reasonable jury could find that plaintiffs suffered severe

emotional distress because of defendants' conduct.  Accordingly, summary judgment will be

denied on Count 3 for all defendants.

### E.      Count 4:  Civil Conspiracy

Count 4 alleges a claim for civil conspiracy.  Specifically, the amended complaint alleges

that "[d]efendants joined together to act in concert and by agreement over the course of several

years for the unlawful purpose of threatening, intimidating, harassing and coercing Plaintiffs

into . . . remov[ing] trees from Plaintiffs' own property."  (Amend. Compl. ¶ 104).

To establish a civil conspiracy, "a plaintiff must demonstrate that 'a combination of

persons [acted] pursuant to an agreement to injure the plaintiff.'"  *Gutierrez v. Massachusetts*

*Bay Transp. Auth.*, 437 Mass. 396, 415 (2002) (quoting J.R. NOLAN & L.J. SARTORIO, TORT LAW

§ 99, at 136 (2d ed. 1989)).  In other words, "[i]t is not sufficient to prove joint tortious acts of

two or more persons"; rather, a plaintiff must show that those acts were taken in furtherance of

an agreement to cause injury.  *Id.*

Massachusetts recognizes two types of civil conspiracy.  The first category, "true

conspiracy," is itself an independent tort—no other tortious acts must be shown.  *See*

*Massachusetts Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 244

(D. Mass. 1999); *Fleming v. Dane*, 304 Mass. 46, 50 (1939).  To rise to the level of an

independent tort, the "mere force of numbers acting in unison" must "make a wrong."  *Fleming*,

304 Mass. at 50 (quoting *DesLauries v. Shea*, 300 Mass. 30, 33 (1938)).  The plaintiff must show

that defendants acting "in combination" had "some peculiar power of coercion" that the same defendants acting alone would not have possessed. *Id.* (quoting *DesLauries*, 300 Mass. at 33).

The second category of civil conspiracy is based on § 876 of the Second Restatement of Torts.  That type extends liability for the torts of another when there has been a "concerted action." *Thomas v. Harrington*, 909 F.3d 483, 490 (1st Cir. 2018) (quoting *Kurker v. Hill*, 44 Mass. App. Ct. 184, 188 (1998)).  It is, in essence, a form of vicarious liability.  "Because it is vicarious liability, this type of civil conspiracy requires an underlying tort and the conspiracy consists in agreeing to, or assisting in, this underlying tort." *Id.* (alterations omitted) (quoting *Taylor v. American Chemistry Council*, 576 F.3d 16, 35 (1st Cir. 2009)).  Plaintiffs seek recovery under both theories.  (Pls. Opp'n to Rudnick Mot. at 22).

Rudnick states only that plaintiffs "have not asserted any claim that will survive summary judgment." (Rudnick Mem. at 19-20).  That conclusory statement fails to "inform[] the district court of the basis for [his] motion, [by] identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which [he] believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  A party moving for summary judgment "has the initial burden of production, which it can meet either by offering evidence to disprove an element of the plaintiff's case or by demonstrating an 'absence of evidence to support the non-moving party's case.'" *Rakes v. United States*, 352 F. Supp. 2d 47, 52 (D. Mass. 2005), *aff'd*, 442 F.3d 7 (1st Cir. 2006) (quoting *Celotex Corp.*, 477 U.S. at 325 (1986)).  Rudnick has not met that burden, and the burden does not shift to plaintiffs to present controverting evidence. *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 929 (1st Cir. 1983).

Accordingly, Rudnick's motion for summary judgment as to Count 4 will be denied.[23]

### F.      Count 5:  Abuse of Process

Count 5 alleges abuse of process based on the three sets of actions:  (1) Rudnick's NTO applications, (2) the Kirchicks' ZBA special permit applications, and (3) the lawsuits filed by Rudnick and the Kirchicks in Barnstable Superior Court.  (Amend. Compl. ¶ 107).

To establish a claim of abuse of process, a plaintiff must show (1) that "process" was used against him, (2) for an "ulterior or illegitimate purpose," and (3) that some harm occurred as a result.  *Psy-Ed Corp. v. Klein*, 459 Mass. 697, 713 (2011).  "To sustain the claim, 'the fact finder must find that process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed.'"  *Id.* (quotation marks omitted) (quoting *Millennium Equity Holdings, LLC v. Mahlowitz*, 456 Mass. 627, 636 (2010)).  "More specifically, abuse of process has been described as a 'form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money.'"  *Vittands v. Sudduth*, 49 Mass. App. Ct. 401, 406 (2000) (quoting *Cohen v. Hurley*, 20 Mass. App. Ct. 439, 442 (1985)).

### 1.      Process

The Kirchick defendants first move for summary judgment on the ground that an application for an NTO and for a ZBA special permit do not constitute "process" under Massachusetts law.

"Process" refers to "the papers issued by a court to bring a party or property within its jurisdiction."  *Jones v. Brockton Pub. Markets, Inc.*, 369 Mass. 387, 390 (1975).  Abuse of

---

[23] The Kirchicks have moved for summary judgment on Count 4 solely on the basis that it is time-barred. For reasons already stated, the Court will deny summary judgment on that basis.

process claims are limited to three types of process:  writs of attachment, process used to institute a civil action, and process related to bringing criminal charges.  *Id.* at 389-90 (declining to expand abuse of process claims to injunctions).

Because the Kirchicks' ZBA special permit application and Rudnick's applications for NTOs do not fall within one of those three categories, they cannot serve as the basis for an abuse of process claim.

### 2. Ulterior Motive

All defendants next contend that summary judgment is appropriate because plaintiffs have not identified an ulterior purpose for the state-court lawsuits.

"An ulterior purpose is not simply the intent to harm the other party directly by bringing suit, but rather the intent to gain some other end indirectly."  *Psy-Ed Corp.*, 459 Mass. at 713 n.35.  *See also Sensitech Inc. v. LimeStone FZE*, 548 F. Supp. 3d 244, 262 (D. Mass. 2021) (plaintiff must show that defendant "aimed to further a purpose other than winning the lawsuit" (internal quotation marks and citations omitted)).  "'[E]ven a pure spite motive' does not establish that there was an abuse of process if the process is used 'only to accomplish the result for which it was created.'"  *Scholz v. Goudreau*, 901 F.3d 37, 48 (1st Cir. 2018) (quoting *Vigeant v. United States*, 245 F. App'x 23, 25 (1st Cir. 2007)).

The court will consider each lawsuit in turn.

### a. The Kirchick Suit

The Kirchicks' suit alleged trespass, abuse of process related to the temporary HPOs, and declaratory relief concerning the ownership of the private way leading to plaintiffs' property. (Compl., *Kirchick et al. v. Kaiser et al.*, No. 1872CV00397) (Pls. Ex. 241).  The Kirchick defendants contend that their lawsuit was not filed for an ulterior purpose because the complaint survived an anti-SLAPP motion to dismiss in the Superior Court.  (Kirchick Mem. at 19).  That

alone is insufficient to grant summary judgment, as abuse of process claims may be brought even where the underlying suit was meritorious.  *See 477 Harrison Ave., LLC v. JACE Bos., LLC*, 483 Mass. 514, 527 (2019); *Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 408 (2002) ("[I]t is immaterial that the process was properly issued, that it was obtained in the course of proceedings which were brought with probable cause and for a proper purpose or even that the proceedings terminated in favor of the person instituting or initiating them." (citation omitted)).

In any event, plaintiffs have presented sufficient evidence to create a triable issue of fact concerning the Kirchicks' purpose in filing the lawsuit.  (Pls. Opp'n to Kirchick Mot. at 21).  For example, they point to communications from the Kirchicks before, during, and after the suit was filed demanding that the plaintiffs cut down the two pear trees and grant an easement.  (Pls. Exs. 33-34, 119, 231).  Defendants admitted that they had no legal right to force plaintiffs to grant an easement or take down the trees.  (C. Kirchick Dep. at 54-56; W. Kirchick Dep. at 92-93). Plaintiffs also contend that the Kirchicks filed suit to expunge the HPOs issued against them, pointing to an affidavit statement by William Kirchick that they "specifically brought the abuse of process claim to obtain a judicial determination that the [HPOs were] wrongful, for an improper purpose, and constituted a fraud on the Court, so that we could seek expungement of that proceeding . . . ."  (W. Kirchick Aff. ¶ 60).

Massachusetts courts have denied summary judgment on similar facts.  *See, e.g.*, *Vittands v. Sudduth*, 49 Mass. App. Ct. 401, 407 (2000) (issue of fact as to whether neighbors who brought suit to prevent construction of septic system on neighboring lot had ulterior motive of seeking to maintain access to the lot by involving it in protracted litigation); *Powers v. Leno*, 24 Mass. App. Ct. 381, 384 (1987) (issue of fact as to whether landowner who appealed zoning decision had ulterior motive of forcing sale of adjacent property).

### b.   **The Rudnick Suit**

Rudnick's suit alleged that plaintiffs improperly interfered with his offer to purchase the White property.  (*Rudnick v. Kaiser, et al.*, No. 1872CV00426).  Rudnick appears to seek summary judgment on the ground that *plaintiffs* committed abuse of process by using the HPOs to gain leverage in the boundary dispute and White property sale.  (Rudnick Mem. at 20).  An allegation that plaintiffs may have committed abuse of process does not warrant granting summary judgment on plaintiffs' claim against Rudnick.

Furthermore, plaintiffs contend that Rudnick's suit was brought "to force Plaintiffs to either cut down the trees and grant the Kirchicks a view easement or leave town."  (Pls. Opp'n to Rudnick Mot. at 23).  For example, plaintiffs have presented evidence that Rudnick told them that he would "send the suits in" and "make [their] lives miserable" if they didn't comply with his and the Kirchicks' demands.  (Kaiser Dep. at 191, 204).  During the White property dispute, he engaged in extended negotiations with plaintiffs and their lawyers in which he threatened to remove plaintiffs' plants, fence, and mailbox.  There is also evidence that he told the plaintiffs "Now the fun begins" after Judge Walsh declined to extend the HPO against him, and shortly before he filed his lawsuit.  A material issue of fact therefore exists as to whether Rudnick's suit was brought to obtain damages related to the White property dispute, or for the ulterior purpose of forcing plaintiffs to give up property rights in their own home.

Accordingly, both defendants' motions for summary judgment on Count 5 will be granted insofar as plaintiffs' abuse of process claims are based on the applications for the NTOs and the ZBA permit.  Both motions will be denied with respect to the lawsuits filed in Barnstable Superior Court.

**IV.**  <u>**Conclusion**</u>

For the foregoing reasons,

1.      The motions of defendants Ronald Rudnick and William and Carol Kirchick for

summary judgment is GRANTED as to Count 1, to the extent it is based on

improper interference with plaintiffs' right to enjoy public establishments without

fear of discrimination; GRANTED as to Count 2; GRANTED as to Count 5, to the

extent it is based on the applications for the no-trespass orders and the Zoning

Board of Appeals permit; and otherwise DENIED.

2.      Defendants' joint motion to strike is DENIED.

**So Ordered.**


                                        /s/ F. Dennis Saylor IV
                                        F. Dennis Saylor IV
Dated:  March 15, 2023                   Chief Judge, United States District Court